[No. 18335.  Department One.  March 28, 1924.]

F. M. JORDAN, *Plaintiff*, v. JORDAN-WENTWORTH & COM-
PANY, *Defendant*, H. W. STARRETT, *Appellant*,
ARTHUR J. COHEN, *as Receiver, et al.,*
*Respondents.*[1]

PLEDGES (11)—REDEMPTION—INSOLVENCY OF PLEDGEE—RIGHTS AND
LIABILITIES OF CREDITORS—EQUITY.  Where corporate stock was de-
posited with a brokerage corporation as collateral security for stock
purchased, and repledged by it in the usual course of business, on
the insolvency of the corporation all creditors should receive the
same dividends on their claims; hence the pledgor of stock is en-
titled to its return only on paying the proportionate amount which
his collateral bears to the entire collateral of all creditors similarly
situated, to make up the amount for which his stock was repledged
in excess of that for which he pledged it.

Appeal from an order of the superior court for King
county, Dykeman, J., entered July 14, 1923, denying
the claim of a creditor in receivership proceedings,
after a hearing to the court.  Affirmed.

*Grinstead, Laube & Laughlin* and *Harry A. Rhodes,*
for appellant.

*Bausman, Oldham, Bullitt & Eggerman,* for respond-
ents.

MACKINTOSH, J.—Jordan-Wentworth & Company, in
1923, was a stock brokerage corporation, dealing in
stocks on the New York exchange.  It maintained
offices in Seattle, Tacoma and Portland, Oregon, and
in New York had E. F. Hutton & Company as its corre-
spondent.  The business was in chief carried on as fol-
lows: an order would be placed with Jordan-Went-
worth & Company for the purchase of stocks in New
York, the customer making a deposit on the purchase
price of the stocks of approximately ten per cent of
such price, this deposit sometimes being made in cash

[1]Reported in 224 Pac. 389.

and sometimes by the deposit of other stocks as collateral securities, the first deposit being called a margin and the second, collateral security for a margin. Jordan-Wentworth & Company would then transmit to its correspondent, E. F. Hutton & Company, in New York, an order for the purchase, which would be executed and Hutton & Company would hold the stock as security for the balance of the purchase price. Hutton & Company would not know the customer of Jordan-Wentworth, but carried all its accounts, charges and credits with Jordan-Wentworth & Company, and this latter company would keep an account on its books in the name of its customer, charging the customer with the purchase price of the stock and crediting him with the margin, or if no margin was put up, a notation would be made that the customer had collateral security for a margin on deposit. Jordan-Wentworth would charge the customer interest on his debit balance and credit him with any dividends on the stocks which he had purchased. If the stocks were sold at a profit, the customer received credit for the profit, and if they were sold at a loss, he was charged with such loss.

After this statement of the general plan of the business, the particular facts involved in this appeal can be stated as follows: H. W. Starrett, the appellant, in September, 1922, ordered Jordan-Wentworth & Company to purchase for him 400 shares of the Canadian Pacific stock, and on September 12 he deposited, as collateral security for a margin, 100 shares of Superior Portland Cement Company's stock, the deposit being made under a written agreement that "it is mutually understood and agreed that the above described securities may be pledged by Jordan-Wentworth & Company for the amount due thereon, either separately or together with other securities, without further notice."

The purchase order was sent by Jordan-Wentworth & Company to Hutton & Company in New York, who there purchased on the New York stock exchange 400 shares of Canadian Pacific stock, Hutton & Company charging Jordan-Wentworth & Company with the value of the stock so purchased, and Jordan-Wentworth & Company charging Starrett with that amount, noting that collateral security had been deposited by the customer. On November 15, 1922, Jordan-Wentworth & Company demanded further security from Starrett, who deposited 50 additional shares of Superior Portland Cement Company's stock, but no express authority was given at that time to re-pledge this second deposit.

Thereafter Jordan-Wentworth & Company became insolvent and a receiver was appointed, when the following situation, as far as the Starrett transaction is concerned, came to light; the appellant owed Jordan-Wentworth & Company for 400 shares of Canadian Pacific stock and had on deposit as collateral security 400 shares of Canadian Pacific stock in the hands of Hutton & Company to secure Jordan-Wentworth & Company's indebtedness to that company, and 150 shares of Portland cement stock. These with other securities belonging to other customers had been re-pledged by Jordan-Wentworth & Company with the National Bank of Commerce of Seattle for an indebtedness amounting to approximately $74,000. It appears that the re-pledge to the National Bank of Commerce was not the only re-pledge made by Jordan-Wentworth & Company of stock held by it as collateral security to cover purchases in New York. Under similar circumstances there were pledges to different banks for indebtedness owed them by Jordan-Wentworth & Company aggregating $160,000. This collateral belonged to 68 collateral customers whose indebtedness to Jor-

dan-Wentworth & Company approximated $60,000, so that their collateral had been re-pledged for an amount $100,000 in excess of their debit balances to Jordan-Wentworth & Company. Jordan-Wentworth & Company's indebtedness to Hutton & Company amounted to approximately $914,000.

Upon the receiver's taking possession of the business it was determined, in order to save as much as possible, to have Hutton & Company immediately sell all the stock which it held as collateral to Jordan-Wentworth & Company's indebtedness, which was done, and Hutton & Company sold on the New York stock exchange the collateral, receiving therefrom the sum of approximately $1,200,000, and after deducting certain charges not necessary here to set out, remitted a balance of approximately $254,000 to the receiver, who, under the order of the court, took $160,000 thereof and paid off the banks and received the collateral which the banks were holding, including that of the appellant.

The transaction by which the Hutton company sold the stocks in New York, so far as it concerns appellant, had this effect: the appellant owed for the 400 shares of Canadian Pacific stock the sum of $59,811.79, and the sale of that stock in New York netted $59,039, leaving the appellant indebted to the Jordan-Wentworth Company in the sum of $772.79. The appellant tendered to the receiver this sum and demanded the return of his collateral. The receiver, however, claimed that the appellant was not entitled to a return upon those conditions, but that the appellant should suffer the same pro rata loss as the other customers of Jordan-Wentworth & Company and that he could only secure a return of his collateral upon paying his proportionate share of the loss. It appears that Jordan-Wentworth & Company will pay to its creditors ap-

5—129 WASH.

proximately sixty-five cents on the dollar, and the court ordered that the collateral be returned to the appellant upon his paying the proportionate amount which his collateral bore to the entire collateral re-pledged to the banks to make up the over-pledge of $100,000, and from this order, Starrett has appealed.

Jordan-Wentworth & Company had over 400 customer's accounts, and under the orders of the court the receiver is to pay those creditors so that each will receive the same dividend on his claim, whereas it is the appellant's position that he should suffer no loss at all.

The situation is a complicated one and the appellant argues several theories which he claims would entitle him to the relief he seeks, but as nearly as we can see the light, it points to the affirmance of the court's order, based upon the maxim that equality is equity. In dealing with a case somewhat similar to this in *In re Toole,* 274 Fed. 337, the court said:

"The courts in the United States and England have long acted upon the principle that between different creditors equality is equity. Equality, according to Bracton, constitutes equity itself. All debts are generally deemed by courts of equity to stand in pari jure and are to be paid proportionally. In the case of stock unlawfully pledged and belonging to different owners, the equities are originally equal, and that equality is not disturbed by the fact that the stock of one is sold by the pledgee, while that of the other survives. So the principle of general average applied in maritime and commercial operations, and which required a general contribution to be made by all parties in interest towards a loss which is voluntarily incurred for the benefit of all, is indicative of the rule which should be applied in a case like this. The principle upon which contribution is founded does not rest upon contract but has its origin in natural law. Story's Equity Juris., Vol. 1, sec. 490."

The appellant knew that the stock which he was pledging with Jordan-Wentworth & Company would be re-pledged by it in the usual course of business. As to the first deposit of collateral, he expressly agreed that this might be done, and as to the second, he was charged with knowledge of the general custom. But whether rightfully or wrongfully it matters not, this re-pledge to the banks enabled Jordan-Wentworth & Company to carry on its business, and the sum of $100,000 which it received from the banks in excess of the amount for which the stock was pledged to it was received and went to swell the general assets of the concern and to reduce the amount of the indebtedness of Jordan-Wentworth & Company to Hutton & Company, and the net balance of $254,000 received from Hutton & Company was increased by virtue of the amounts received from re-pledges to the banks. It would be grossly inequitable for the appellant to compel the receiver to take $160,000 of that amount received from Hutton & Company to redeem the pledge of his stock, with that of others similarly situated, and to compel the delivery to him of the stock so redeemed free from all loss which other creditors would have to suffer. To allow the appellant to emerge wholly without loss would increase the loss suffered by the other collateral and cash customers, whose money would be used to redeem the appellant's collateral from the excess pledge. The record discloses that the other 67 customers, situated as is the appellant, all have approved the order as made.

As a matter of fact, although the appellant argues to the contrary, the collateral customers and the cash customers are really in no different positions and should receive the same benefits and suffer the same losses. A cash customer may have deposited $10,000 as a margin to secure the performance of his contract

of purchase, and when Jordan-Wentworth & Company
became insolvent would receive on his claim of $10,000
the sum of $6,500. Suppose a collateral customer, in-
stead of depositing $10,000 in cash, had deposited
$20,000 worth of securities to cover a margin of $10,000
due from him to Jordan-Wentworth & Company, and
then Jordan-Wentworth & Company had taken his col-
lateral and re-pledged it for the sum of $20,000, he
should, on the principle of equality, suffer a loss of
35% of the amount for which his collateral was re-
pledged in excess of the amount for which he had
pledged it to Jordan-Wentworth & Company, and that,
as we understand it, is the basis upon which the matter
has been figured out and ordered by the trial court.

Both the appellant and the respondent rely upon the
case of *Skiff v. Stoddard*, 63 Conn. 198, 26 Atl. 874, 28
Atl. 104, and while considerable is contained in that
case which lends aid to the appellant's contention, still,
where the case considers the question of excess pledges,
it seems to support the conclusion to which we have
arrived, for the court says:

"Before the plaintiffs can recover their stocks there
must be, of course, a discharge of the several pledges.
This discharge implies that the indebtedness of each
plaintiff to the insolvent firm must be paid. Unfor-
tunately for the plaintiffs, most of their stocks and
securities will not thus become released. They are in
the hands of third persons, who rightfully hold them
as security for certain debts of Bunnell & Scranton,
and from whom they cannot be taken by their debtor
owners until these debts are satisfied. Most of them
thus stand subpledged, together with the stocks and
securities of other customers. . . . The burden
incident to the recovery of these stocks so re-hypoth-
ecated, in so far as it exceeds that involved in the
payment of the plaintiff's various debit balances upon
the insolvent's books, must be borne in some manner
by the property held in pledge. Shall it be averaged

upon all the property so held, or are there certain stocks and securities which the plaintiffs may rightfully ask to be first appropriated to this purpose? We have already noticed that the power to re-pledge, as exercised, was impliedly given by the plaintiffs to Bunnel & Scranton. The repledging was therefore not wrongful. We have also had occasion to observe that all the stocks and securities which Bunnell & Scranton were carrying for their outside customers were held by them under like conditions, and that the legal relations of all such customers thereto were precisely similar. As between creditor and debtor customers there clearly exist no priorities. . . . If we look more closely at the circumstances of the pledges we notice that while they are Bunnell & Scranton's, they were incurred for the benefit, indirectly at least, of the customers. The nature of the business undertaken by Bunnell & Scranton's customers through them demanded the use of a large capital. The methods employed were designed to enable the customers to have the benefit of such capital without themselves furnishing it. It was not expected that the brokers would have it. It was understood that it was to be obtained in the way it was obtained. . . . To secure this benefit, not otherwise easily, if at all, obtainable, the customers were willing that their stocks should be given as collateral. The assignment found them so hypothecated. It found other creditors of the firm. The plaintiffs had in effect loaned it the use of their stocks to enable money to be raised to carry on their enterprises. . . . We think that both classes of customers ought to accept the situation as they find it, and that plaintiffs are not, under the circumstances, entitled to assert as their equitable right that which would necessarily result in giving them a priority over other creditors. The burden incident to the discharge of any pledge made by Bunnell & Scranton must therefore be averaged among all the stocks and securities held in such pledge.''

Where the transactions have become so numerous and complicated and the situation has become so gen-

erally confused that its solution presents all those difficulties which are associated with the unscrambling of eggs, the most that can be accomplished is that all creditors be treated alike, and that was what was done in this matter, and the order accomplishing it is therefore affirmed.

MAIN, C. J., HOLCOMB, TOLMAN, and MITCHELL, JJ., concur.