## Derringe, Appellant, *v.* Donovan et al.

Argued May 24, 1932. Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*M. A. Kilker,* with him *H. O. Bechtel, Cyril Kilker* and *Edgar Downey,* for appellant.—The Act of February 17, 1906, P. L. 36, was held to be the latest of a series of statutes extending the direct and immediate control of law over methods and details of the exercise of the elective franchise which previously had been left in the unrestricted discretion and control of individuals

or party minorities. Its provisions are mandatory: Com. v. King, 6 Pa. D. & C. 155; Quimby's Case, 40 Pa. C. C. R. 213.

The Act of Assembly approved the 12th day of July, 1913, P. L. 719, section 17, supplements the previous act, but does not in any way change the method prescribed by law for filling vacancies.

*C. E. Berger, Z. F. Rynkiewicz, M. M. Burke* and *P. H. Burke,* for appellees, were not heard.

OPINION BY MR. JUSTICE MAXEY, June 30, 1932:

At the municipal election held November 3, 1931, in the township of West Mahanoy, Schuylkill County, Bartley J. Flannery, David J. Cooney, Tally C. Derringe and Terrance B. Deane were candidates for the office of school director. There were two to be elected. One of these candidates, Bartley J. Flannery, died six days before the election, and there was no attempt made to substitute another candidate to fill the vacancy on the ticket caused by his death. At the close of the polls, it was found that the deceased, Bartley J. Flannery, had received the highest number of votes polled, to wit, 1921. David J. Cooney received the next highest number of votes polled, 1880. Tally C. Derringe received the next highest number of votes polled, 930. Terrance B. Deane received 884 votes. The returns of these votes were duly made to the clerk of the courts of Schuylkill County. Before the clerk issued a certificate of the result of the election, Derringe served written notice upon the clerk to deliver the certificate to him, Derringe. The clerk, however, issued certificates of election to Bartley J. Flannery, the deceased, and to David J. Cooney. Thereupon Derringe demanded and received from the clerk a certificate of the result of the election. Upon receiving this certificate, he took the oath of office as a member of the school board of West Mahanoy Township. Derringe then served upon the president of

the school board his oath of office and the certificate of the clerk showing the result of the election and the affidavit that Bartley J. Flannery, the candidate, had died on October 28, 1931. When the school board met for reorganization, Derringe appeared and filed with the secretary the oath, the affidavit and the certificate. These the secretary declined to receive. The school board refused to recognize Derringe as a member of the board and refused to permit him to participate in any way in the proceedings of the school board. Thereupon he presented his petition for an alternative writ of mandamus, and an answer having been filed, the issue came before the Honorable CYRUS M. PALMER, Judge of the Court of Common Pleas of Schuylkill County, who dismissed the petition.

The question is whether or not votes cast for a dead man who is listed on the ballot as a candidate for office and who received the most votes shall be treated as nullities, and the next highest candidate (when there is only one candidate to be chosen) or the next highest two candidates (when there are two to be chosen) shall be declared elected. Appellant argues that, since Flannery by his death became nonexistent, he could not be elected to office, and, therefore, votes cast for him should be treated as nullities, and the next two highest candidates should be declared the duly elected school directors.

Section 222 of the Act of 1911, P. L. 309, 322, provides: "The number of votes cast for the several candidates for school directors in all school districts in this Commonwealth at any election, shall be returned by the election officers, as provided by law, and the clerk, prothonotary, or other proper authority, shall, within ten days thereafter, under seal of the court, certify the result of the election to each candidate duly elected, and a duplicate copy of each of such certificate shall be mailed to the president of the board of school directors in the district in which such person or persons were elected."

This certificate constitutes the credentials of the party duly elected. The Act of 1911 further provides, section 302, as to the use to be made of the election certificate at the organization meeting. It says: "The certificates of the election or appointment of all new school directors shall be read, and a list of the legally elected or appointed and qualified school directors prepared."

It is thus obvious that the statute provides that a newly elected director can become a member of the school board only when he has filed, first, his certificate of election, and, second, his oath of office.

The duties of the election officers are at an end when they have counted and made a return of the votes cast to the clerk of the courts. They do not issue certificates of election. The clerk of the courts certifies the result to each candidate duly elected and mails a copy of each certificate to the president of the board of school directors in the proper district.

To accept appellant's theory in this case, we would have to hold that the election officers should not treat a candidate who had died as "a candidate," and should not count or return the votes cast for him, that his name on the ballot should be treated as surplusage and the votes cast for him as nullities, and that the election officers should return the number of votes cast only for the living candidates.

While the statute provides how substitutions may be made on the ballot for candidates who have died before the date of election, it makes no provision for a situation such as we now have before us. The Act of June 10, 1893, P. L. 419, section 11, provides, inter alia, "In case of the death or withdrawal of any candidate nominated as herein provided, the party convention, primary meeting, caucus, or board, or the citizens who nominated such candidate, may nominate a substitute in his place, by filing in the proper office at any time before the day of election, a nomination certificate or paper, which

shall conform to all of the requirements of this act in regard to original certificates or papers."

The Act of July 12, 1913, P. L. 719, section 17, while supplementing the act quoted, does not change the method prescribed for filling the vacancies. It provides, inter alia, "Vacancies happening or existing after the date of the primary may be filled in accordance with the party rules as is now or may hereafter be provided for by law." In the case before us no such substitution was made. Whether or not there was time in which to make such substitution is a question we need not here consider.

The casting of a ballot is only a legal expression of the voters' will as to the men or measures voted upon, and it is a fundamental principle of popular government that in elections the will of the majority shall prevail, and when it becomes impracticable by reason of the large number of candidates for a certain office to ascertain the will of the majority, the will of the plurality shall prevail. In 20 C. J. at page 207, section 267, is this expression: "It is a fundamental idea in all republican forms of government that no one can be declared elected and no measure can be declared carried, unless he or it receives a majority or a plurality of the legal votes cast in the election."

The result of the voting at the time and place under discussion was that a decisive majority of the voters registered their will that Flannery and Cooney should be school directors, and that Derringe and Deane should *not* be school directors. It is true that the will of the voters was thwarted as to Flannery by his death six days previously. But the popular will was registered with equal emphasis that Derringe and Deane should not be school directors. The courts will not attempt to thwart such an expression of the popular will by declaring that Derringe whose candidacy was rejected was in fact chosen. In order to sustain such a conclusion, the courts would have to hold that the voters who voted for Flannery knew that he was dead and that by voting

for a dead man they, in effect, declared that they did not wish to express any will as to the choice of at least one of the two directors to be elected. This would lead to the result contended for by appellant, to wit, that Cooney and Derringe were the two men chosen by the popular will so far as that will was expressed.

This conclusion is based on a premise that is palpably opposed to fact. It is absurd to hold that the 1921 voters who voted for Flannery, meant to "throw their votes away," or meant that their votes for Flannery would be ineffective for any purpose. If the voter did not know that Flannery was dead, his vote meant that he chose Flannery for school director and rejected the candidates he voted against. If he knew that Flannery was dead, his vote for him meant that he preferred that a temporary vacancy should exist in the office of school director rather than that either of the two men he voted against should fill that office for a full term. Logic requires us to hold that the voters who voted for Flannery knowing that he was dead (and it is conceded that practically all of the voters did know that he was dead) were really voting for the creation of a vacancy in the office of school director, so that this vacancy might later be filled in the manner prescribed by law.

This conclusion is consonant with considerations of sound public policy. It might easily happen that all of the accredited candidates for one of the highest offices in the state should die on or just before election day, and that one or a few of the voters would write on their ballots the name of an incompetent or unworthy person as their choice for that office, and if it were the law that the votes cast for dead candidates were nullities, then the few votes cast in the contingency stated for a person whose name was written on the ballot would elect him. At the present time a party avowedly opposed to American institutions, and which in its recent national convention had its convention walls decorated with pictures of communistic leaders of a country with which the

United States does not maintain diplomatic relations, nominated candidates for President and Vice-President of the United States. If we had popular elections of President instead of election by an electoral college, it could happen that in the event of the deaths of the candidates of the other national parties on or just before election day, that the candidate of this un-American party would be elected chief executive of the nation. An analogous situation could easily arise in any state, county or city where popular elections of public officials prevail. It could happen that candidates of the major political parties might die on or just before election day and if the ruling contended for by the appellant should be given legal force, a person who might be voted for by only a comparatively inconsequential number of voters would be invested with an important public trust. Such a rule of law would not facilitate the recognition of the popular will, but would make possible its nullification.

Popular will is likewise nullified under the ruling appellant contends for when one winning candidate for office dies on or before election day. Opposing candidates for many public offices represent opposing principles and policies. The personality of the candidate is ofttimes less important than the policies his candidacy represents, and electors vote not merely for persons, but for principles. This may be the fact even in the election of school directors. Voters may hold diverse views as to school curricula and school management, and in a representative government the accredited way for a majority of voters to impose their will on a governing agency is to elect representatives to it who will officially register that will.

To hold that the votes cast for a contemporaneously or recently deceased winning candidate for governor or United States senator or congressman or school director shall be regarded as nullities, and that his opponent who was voted for by only a minority of the voters is in fact elected, because he receives the highest vote among the

candidates who are alive at the time of the closing of the polls, is repugnant to the principle of majority rule, which is the corner stone of orderly government. The principles of popular government require that votes cast for a dead man as a candidate for public office shall not be considered mere nullities, but that they shall be regarded as expressions by the voters that they prefer the office to be declared temporarily vacant until it can be filled in the manner provided by law rather than that a person whom they voted against and who represents opposing policies should fill it for a full term. Our conclusion is that where the votes cast for a dead candidate for public office would be, were he alive, sufficient to elect him, that office becomes vacant on the day that he would, but for his death, have assumed its duties, unless in the meantime another has in obedience to the prescriptions of law been appointed or elected to it.

The question raised was ably discussed and correctly decided by Judge PALMER of the court below.

The decree is affirmed at appellant's cost.