STATE OF WEST VIRGINIA *ex rel.* OTIS JACKSON

*v.*

COUNTY COURT OF MCDOWELL COUNTY, *a Corporation,* E. L. ST. CLAIR, *Its President,* ADRIAN VANCE AND HARRY G. CAMPER, JR., *Commissioners Thereof,* AND A. M. (TINKER) ST. CLAIR, *Clerk of Said Court*

(No. 12800)

Submitted March 4, 1969.          Decided March 25, 1969.

*J. Strother Crockett, A. C. Cunningham, W. H. Ballard, II,* for relator.

*Rudolph J. Murensky,* Prosecuting Attorney, *Wade T. Watson,* Assistant Prosecuting Attorney, for respondents.

CALHOUN, JUDGE:

In this mandamus proceeding, instituted in this Court pursuant to its original jurisdiction in cases of this character, Otis Jackson, the relator, seeks to require the County Court of McDowell County, E. L. St. Clair, its president, Adrian Vance and Harry G. Camper, Jr., commissioners, and A. M. (Tinker) St. Clair, clerk of the county court, to recognize the relator as a justice of the peace of Browns Creek District of McDowell County duly elected as such at the General Election held November 5, 1968; to permit the relator to give bond and otherwise to qualify as such justice of the peace; and to rescind an order entered by the

county court on January 7, 1969, by which it was declared that there was a vacancy in the office in question and by which order Archie Day was appointed as a justice of the peace pursuant to the provisions of Code, 1931, 3-10-7, as amended, to fill the alleged vacancy. The power of the county court to fill the vacancy, if one existed, is not controverted. *State ex rel. Conley* v. *Thompson,* 100 W. Va. 253, 260, 130 S. E. 456, 459.

At the General Election held on November 5, 1968, Norman Baker and E. Lonnie Mitchell were the Democratic nominees and candidates and Otis Jackson, the relator, and Donald Lester were the Republican nominees and candidates for the two offices of justice of the peace for Browns Creek District. Twenty-seven days before the General Election, E. Lonnie Mitchell died. At the time of Mitchell's death, there was insufficient time remaining before the General Election to permit the filling of the vacancy in accordance with the provisions of Code, 1931, 3-5-19, as amended, in the party nomination which was caused by Mitchell's death.

Notwithstanding the death of E. Lonnie Mitchell, the names of all the four persons appeared as nominees and candidates on the General Election ballot. The result of the voting, as disclosed by the election returns, was as follows:

| | |
|---|---|
| Norman Baker | 4,326 votes. |
| E. Lonnie Mitchell | 3,717 votes. |
| Otis Jackson | 1,431 votes. |
| Donald Lester | 1,283 votes. |

Inasmuch as two justices of the peace were to be elected for Browns Creek District, and inasmuch as Otis Jackson, the relator, received the second highest number of votes among the three candidates who were living on the day of the General Election, he asserts in this proceeding, and asserted before the county court, that he and Norman Baker were duly elected.

In the mandamus petition the relator alleges that the fact of the death of E. Lonnie Mitchell was made a matter

of general knowledge, prior to the election, among the voters of Browns Creek District by news accounts disseminated widely by newspapers, radio and television; that voting machines are used in voting in elections held in McDowell County; and that "straight ticket" voting "is customarily used by the vast majority of the voters in Browns Creek District, McDowell County, the general tenor of political campaigns being to persuade the voters to vote the straight ticket for their party, and in particular for the Democratic Party of McDowell County." It is alleged in the petition that "the vast majority of the 3,717 votes cast for E. Lonnie Mitchell were not votes cast specifically for him, but were purely mechanical votes, resulting from pulling the lever for the Democratic straight ticket." It is further alleged "that said votes for E. Lonnie Mitchell were void and of no effect, and could not be counted for or against any person;" that the relator and Norman Baker were duly elected as justices of the peace for the regular four-year term commencing January 1, 1969; that the relator appeared before the county court and its clerk on December 23, 1968, and offered to execute his official bond as justice of the peace; that he was then requested by the clerk to appear before the county court at its meeting to be held on December 30, 1968, at which time the relator appeared before the county court and again offered to execute his official bond but that the court deferred action on the matter until its next meeting held on January 7, 1969, at which time the relator again appeared before the county court and, by a proper motion in writing, requested that he be permitted to execute his official bond and otherwise to qualify for the office of justice of the peace of Browns Creek District.

From the allegations of the petition, supplemented and substantiated by an order entered by the county court, it appears that, at its meeting held on January 7, 1969, the county court declared that a vacancy in one of two offices of justice of the peace for Browns Creek District existed by reason of the death of E. Lonnie Mitchell on October 9, 1968, and that, by a two to one vote of the three commissioners of the county court, Archie Day was nominated and appointed to fill the vacancy until the next general election,

upon his taking an oath of office and executing an official bond as required by law.

An answer filed in behalf of all the respondents admits substantially all the material allegations of the petition, except that the answer alleges that they have no knowledge whether the fact of the death of E. Lonnie Mitchell was widely publicized and that they demand strict proof thereof; and that, although "it is true the general tenor of political campaigns in McDowell County is to encourage the voting public to vote a straight ticket, respondents have no knowledge as to whether this practice is followed by the voting public." The respondents further allege in their answer that they "have no knowledge of the truth of the allegation that the vast majority of votes cast for E. Lonnie Mitchell were purely mechanical votes resulting from a straight ticket, but state, inasmuch as these votes were tabulated under his name, that they were cast specifically for him."

In addition to their answer, the respondents filed a motion in writing to dismiss the mandamus petition on the ground that Otis Jackson, the relator, did not demand or institute a timely election contest proceeding pursuant to the provisions of Code, 1931, 3-7-6, as amended. That statute, by its clear language, provides a procedure by which one may "contest the election of another to any county or district office, * * *." The subsequent language of that statute provides, among other things, that the person desiring to contest the election of another, "shall, within ten days after the result of the election is declared, give the contestee notice in writing of such intention, and a list of the votes he will dispute, with the objections to each, and of the votes rejected for which he will contend. * * *." The statute in its entirety discloses that it provides a procedure for a contest between two living persons who previously opposed each other as candidates by means of which to determine the validity or invalidity of disputed votes and, on that basis, to determine which candidate was elected. This case does not involve a dispute of that character. The number of the votes cast for each of the four candidates is

not disputed. The question here involved calls for a determination whether, by reason of the death of E. Lonnie Mitchell, any candidate in addition to Norman Baker was elected; whether, in the circumstances, a vacancy in an office resulted; and whether the county court was legally justified in declaring the vacancy and in filling it by the appointment of one who was not one of the four candidates. The motion of the respondents to dismiss the petition, therefore, is overruled.

The case was submitted for decision in this Court upon the pleadings, with exhibits attached thereto and made a part thereof, upon certain stipulations and upon briefs and oral argument of counsel. The facts material to a proper decision of the case are undisputed. The basic question arising from the death of E. Lonnie Mitchell in the circumstances of this case is a question of law. Norman Baker and E. Lonnie Mitchell each received a plurality of the total number of votes cast for the four candidates. Baker was therefore elected to one of the two offices to be filled and the votes cast for Mitchell would have been sufficient to elect him if he had continued to live until the results of the election were declared. The legal question is whether Jackson, not having received a plurality of the total votes cast, may nevertheless be declared to have been elected merely on the basis of his having received a plurality of the votes cast for the three living candidates.

This case presents a question of first impression because of the death of a nominee, E. Lonnie Mitchell, twenty-seven days before the election. The Court, however, has decided prior cases involving candidates who would have been elected on the basis of votes received by them had they not been disqualified for various reasons to hold the offices to which they sought election. *Dryden* v. *Swinburne,* 20 W. Va. 89, involved a contest between two candidates for election to the office of clerk of the Circuit Court of Kanawha County. It was judicially determined that Swinburne was an alien, that therefore he was ineligible to hold the office, that the election was a "failure," even though he received a majority of the votes cast and that this resulted

in a vacancy in the office. The ninth point of the syllabus is as follows: "If an alien and a citizen eligible to office are candidates for the same, and the alien receives the majority of the votes cast at the election, though such alien be declared ineligible to the office upon a contest between them, the citizen, who receives a minority of the votes cast, cannot be declared entitled to the office; but it must be held to be vacant." Preliminary and procedural aspects of the same controversy were previously before the Court twice, the opinions being reported in 15 W. Va. 234 and in 15 W. Va. 483.

The second point of the syllabus of *State ex rel. Depue* v. *Matthews,* 44 W. Va. 372, 29 S. E. 994, is as follows: "Where two parties are opposing candidates for the office of sheriff, and the one receiving the highest number of votes for the office disqualifies himself from holding the same by contracting to farm or sell the office or a portion thereof, such fact does not confer any interest in the office on the party receiving the minority of the votes cast at the election." Following is the second point of the syllabus of *Orndorff* v. *Potter,* 125 W. Va. 785, 25 S. E. 2d 911: "Where election of a nominee for membership on a county board of education may not be declared by reason of the fact that there are already two members elected from the magisterial district in which such nominee is a resident, pursuant to Code, 18-5-1, as amended by Chapter 42-5-1, Acts of the Legislature, Regular Session, 1941, the nominee receiving the next highest number of votes, but not a majority or plurality of the votes cast, is not elected." The holding of the *Orndorff* case was subsequently reaffirmed and applied in an almost identical case. *State ex rel. Miller* v. *The Board of Education of the County of Mason,* 126 W. Va. 248, 254, 27 S. E. 2d 599, 603. See also *State ex rel. Morrison* v. *Freeland,* 139 W. Va. 327, 333-34, 81 S. E. 2d 685, 689.

As might reasonably be assumed, unanimity is lacking among decisions of appellate courts concerning legal questions presented for decision of this case, though the prior decisions of this Court to which we have referred in

this opinion tend to sustain that which we believe may properly be regarded as the general rule and the majority view. The following statement appears in 29 C.J.S., Elections, Section 243, pages 676-77:

> "Sound public policy dictates that public elective offices be filled by those who have received the highest number of votes cast in the election for that office, and, it is a fundamental idea in all republican forms of government that no one can be declared elected and no measure can be declared carried unless he or it receives a majority or a plurality of the legal votes cast in the election.

> "Votes cast for a deceased, disqualified, or ineligible person, although ineffective to elect such person to office, are not to be treated as void or thrown away but are to be counted in determining the result of the election as regards the other candidates. Accordingly, the general rule is that the fact that a plurality or a majority of the votes are cast for an ineligible candidate at a popular election does not entitle the candidate receiving the next highest number of votes to be declared elected. In such case the electors have failed to make a choice and the election is a nullity. * * *."

To the same effect see Annot., 133 A.L.R. 320-28; 26 Am. Jur. 2d, Elections, Section 293, pages 117-18.

Two conflicting views are summarized in 26 Am. Jur. 2d, Elections, Section 294, pages 118-19, as follows:

> "Two conflicting views, generally referred to as the English rule and the American rule, have evolved regarding the effect to be given to an elector's ballot where he had knowledge, at the time of casting his ballot, that the person for whom the ballot was cast was dead, ineligible, or disqualified. According to the American rule, such knowledge is not material, and votes cast for a deceased or disqualified person are not to be treated as void or thrown away, but are to be counted, although the voters knew of the death or disqualification. According to the English rule, the voter's knowledge is material, and votes cast for a person known to be deceased or disqualified are to be treated as void and thrown away, and are not to be counted in determining the result of the election as regards

the other candidates, the theory being that voters who, knowing that a person is dead or is ineligible to office by reason of any disqualification, are deemed to mean not to vote for anyone for that office, so that the eligible candidate receiving the next highest vote is elected."

The prior decisions of this Court disclose no evidence of an intent to deviate from or to make an exception to that which has been referred to as the American rule. None of such decisions was based on a determination whether the disqualification or ineligibility of the candidate was or should have been known to the voters or to any appreciable number of them before the election.

We are impressed by the difficulty of stating or formulating general principles of law, pursuant to the English rule, which could be practicably applied to varying situations. The difficulty of proving knowledge on the part of the voters is obvious. Such difficulty would be enhanced or diminished in proportion to the geographical size or extent of the area involved in the voting; in proportion to the available means of disseminating information among the voters; and in proportion to the time the death occurred or the ineligibility arose in relation to the date of the election.

If we assume that, prior to the General Election, the fact of the death of Mitchell was a matter of common knowledge among the voters of Browns Creek District, then it must be recognized that 3,717 voters knowingly cast their ballots for a deceased person with full knowledge that a deceased person could not be elected to a public office. There is a sound basis, in accordance with the American rule, to hold that persons who may have voted for Mitchell with knowledge of his death were casting votes against one or more of the living candidates. An application of the English rule conceivably could result in the election of a candidate who received but a ridiculously small number of the total votes cast and, in this respect, the expressed will of the voters would be flagrantly thwarted. Such a result would be repugnant to the principle of majority rule which is a cornerstone of our form of government.

The English rule has not found general acceptance in this country. It has been soundly criticized on the basis of its lack of sound reason, justice and logic and also on the basis of the practical difficulties involved in its application. 26 Am. Jur. 2nd, Elections, Section 294, pages 119-20; Annot., 133 A.L.R., page 346 et seq.

*Derringe* v. *Donovan,* 308 Pa. 469, 162 A. 439, involved four candidates for election to two official positions as school director. The candidate who received the highest number of votes died six days before the election. In holding that a vacancy was created by his death and that the candidate who received the third highest number of votes could not be declared to have been elected, the court stated (308 Pa. at 475, 162 A. at 440-41):

> "* * * It is absurd to hold that the 1921 voters who voted for Flannery, meant to 'throw their votes away,' or meant that their votes for Flannery would be ineffective for any purpose. If the voter did not know that Flannery was dead, his vote meant that he chose Flannery for school director and rejected the candidates he voted against. If he knew that Flannery was dead, his vote for him meant that he preferred that a temporary vacancy should exist in the office of school director rather than that either of the two men he voted against should fill that office for a full term. Logic requires us to hold that the voters who voted for Flannery knowing that he was dead (and it is conceded that practically all of the voters did know that he was dead) were really voting for the creation of a vacancy in the office of school director, so that this vacancy might later be filled in the manner prescribed by law."

In *Ingersoll* v. *Lamb,* 75 Nev. 1, 333 P. 2d 982, the court similarly applied the American rule and declared a vacancy existed in the office of sheriff in a situation in which one of the two candidates who received the greater number of votes had died before the election and, according to the court's opinion, his "death received wide publicity and most, if not all, electors voting at said general election had knowledge of his death."

*State ex rel. Cleveland* v. *Stacy,* 263 Ala. 185, 82 So. 2d 264, involved an election for the office of tax collector. Twenty-three days prior to the election, Vance Cleveland, the only candidate whose name appeared on the ballot, died. According to the opinion, his death and funeral "were publicized and voters throughout the county had general knowledge of his death prior to the election. The opinion states that, nevertheless, "some 1,590 qualified voters cast their ballots in favor of Vance Cleveland, while forty-nine voters exercised their privilege of writing in the name of a candidate and cast their ballots for Grey Cleveland, wife of Vance Cleveland." The court held that the election for this office was "null and void because of the disqualification (by death) of the winning candidate." Similar holdings were made in the following cases involving deaths of candidates: *Patton* v. *Haselton,* 164 Iowa 645, 146 N. W. 477; *In re Primary Election Held in Lackawanna County,* 345 Pa. 228, 27 A. 2d 189; *State ex rel. Sheets* v. *Speidel,* 62 Ohio St. 156, 56 N. E. 871; *Howes* v. *Perry,* 92 Ky. 260, 17 S. W. 575. See also *Murtagh* v. *Registrars of Voters of Peabody,* 340 Mass. 737, 166 N. E. 2d 702, 704.

For reasons stated in this opinion, the writ of mandamus prayed for is denied.

*Writ denied.*