Josh J. EVANS, a Duly Licensed Attorney and Candidate for District Judge, First Judicial District, State of Oklahoma, Petitioner,

v.

STATE ELECTION BOARD OF the STATE OF OKLAHOMA, Respondent.

No. 76620.

Supreme Court of Oklahoma.

Dec. 18, 1990.

Rehearing Denied Feb. 25, 1991.

Mac Oyler, Oklahoma City, for petitioner.

Robert H. Henry, Atty. Gen., K.W. Johnston, Asst. Atty. Gen., Oklahoma City, for respondent.

Richard C. Ogden, Joel L. Carson, Carson & Mueller, Oklahoma City, for amicus curiae, Beaver County, Cimarron County, Harper County and Texas County Bar Associations.

SIMMS, Justice.

Josh J. Evans, petitioner and candidate for District Judge of the First Judicial District, brings an original action in the nature of *quo warranto* and mandamus seeking to be declared the elected district judge at the November 6th, 1990, general election. He also seeks a certificate of election from the respondent, State Election Board.

The incumbent District Judge, Frank M. Ogden, III, filed for re-election to that office. There being only two candidates, the election was to be held at the general election, with the names of the two candidates appearing on the non-partisan judicial ballot.[1]

On July 13, 1990, Evans contested the candidacy of Judge Ogden before the State Election Board on the grounds that Ogden was "physically and mentally" incapacitated to such a degree that he had been prevented from serving as judge in the past and would be prevented from serving in that capacity if elected. Judge Ogden had served as district judge for the previous thirteen years. Through the last several years he had suffered from cancer.

Respondent Board, on July 17, 1990, conducted a hearing and found that Judge Ogden possessed all the qualifications of a district judge as provided by Art. 7, § 8[2], and Title 20, O.S.1981, § 92i,[3] and that the allegations of incapacity were insufficient to challenge his candidacy. The Board denied the protest and ordered that Ogden's name remain on the ballot. No review of that order was sought by petitioner prior to the general election.

On August 11, 1990, Judge Ogden died, leaving petitioner as the only living candidate on the ballot for the office in question. Petitioner, however, did not resort to any legal forum to have Ogden's name removed from the ballot before the general election. The name of Frank M. Ogden therefore appeared on the general election ballot of November 6, 1990, and Ogden received 10,-426 votes, approximately 91% of the vote total. Petitioner received only 1,049 votes, approximately 9%.

---

1. Title 26, O.S.1981, § 11–110 provides: "If two persons file for the same judicial office, their name shall appear on the ballot only at the time of the General Election."

2. Art. 7, § 8, provides in pertinent part: "... [E]ach district Judge, shall be selected according to the provisions of this Article.

    *    *    *    *    *    *

  (g) Each District Judge shall have had prior to election or appointment, a minimum of four years' experience as a licensed practicing attor-

ney, or as a judge of a court of record, or both, within the State of Oklahoma; shall be a qualified elector of the respective district; and shall have such additional qualifications as may be prescribed by statute."

3. Title 20, O.S.1981, § 92i provides a candidate for the office of district judge must have been a registered voter of the appropriate county for at least six months prior to the first day of the filing period.

Petitioner contends that although he did not receive the highest number of votes cast, he is entitled to be declared the successful candidate because Judge Ogden was disqualified from being a legal candidate and his name should not have been on the ballot. Petitioner submits that because of Ogden's disqualification by death, he was elected by default, needing but one vote to receive the certificate of election.

■ Petitioner launches a two pronged attack. The first being that the Election Board erred in its determination of July 17 that Judge Ogden was legally entitled to be on the ballot, and he seeks our review of that order. In support of this position, petitioner relies on a May 21, 1990, order of this Court assigning another judge to serve as temporary chief judge of that district. The order had been issued when Ogden was hospitalized for a short time. Petitioner's argument that this order effectively removed Ogden from office is without support and we consider it frivolous. This Court has no authority to remove a judge from office. The only provision for removal of a judge lies in Article 7 which requires an action be brought before the Court on the Judiciary. No such action was taken.

Next petitioner argues that by reason of his death, Ogden was removed from the ballot as a matter of law. Petitioner concedes that we have no statutory or case law authority to directly support this theory but he submits that certain constitutional and statutory guidelines should direct the court to hold in his favor.

■ Art. 7, § 8 pertaining to the qualifications and selection of district judges provides that each "shall be a qualified elector of the respective district", and petitioner argues that we should construe this to read that a judge "shall be a qualified elector of the respective district prior to election."

Evans contends that this section requires that a successful candidate for judge must be a qualified elector at the time of the election and he argues that Ogden, being deceased, was not a qualified elector of the district either prior to or at the time of the election and therefore was disqualified as a candidate. Evans also submits that certain election statutes, 26 O.S.1981, §§ 4–120.3, 120.8, 4–111 and 4–112, require that the registration of a deceased voter be canceled by the election board and he therefore, could not be a qualified voter in an election. Additionally, Evans argues that to be a qualified elector under 26 O.S.1981 §§ 4–111 and 112, one must be a "person", and that one who is deceased is not a "person" within the intent of the election laws.

We are not persuaded by Evan's arguments. As we view Art. 7, § 8, the qualifications apply to *candidacy* and must be met before a successful candidate assumes office. No argument is made that Judge Ogden did not meet the required qualifications at the time he filed and until the time of his death.

■ Respondent and amicus curiae argue that petitioner's attack on the Board's order denying Evan's contest as well as the post-election action to declare Ogden disqualified from the ballot is barred by laches. With this argument we must agree.

Petitioner waited 115 days after the Election Board's decision to challenge its ruling. Petitioner made no effort to have Judge Ogden's name stricken from the ballot after he died in August, and before the general election in November, instead he waited until the election took place and the political will of the people had been expressed.

■ It is well settled that one who seeks to challenge or correct an error of the State Election Board will be barred by laches if he does not act with diligence. In *Harding v. State Election Board,* 197 Okl. 291, 170 P.2d 208 (1946), the petitioner waited ten days to seek extraordinary relief against the Board after it removed his name from the ballot. This court found the ten day delay was not diligent and held petitioner barred by laches. The court stated 170 P.2d at 209, that:

"The law fixes a date for holding said election and by reason of the necessary work required and time consumed in causing the ballots to be printed for use in said election, it is manifest that time is

of the essence and it was the duty of the petitioner to proceed with utmost diligence in asserting in a proper forum his claimed rights. The law favors the diligent, rather than the slothful. By reason of his delay in asserting such claimed rights it does not appear that petitioner is entitled to the issuance of the extraordinary and discretionary writ of mandamus. *Sheffield v. Fountain*, 101 Okl. 168, 224 P. 339."

In *Wickersham v. State Election Board*, 357 P.2d 421 (Okl.1960), this Court found that petitioner's failure to raise issues of the legality of candidacy until after the general election was inexcusable delay and barred by laches. While petitioner in the instant case did attempt to challenge Ogden's candidacy before the election, he did not pursue any review of that ruling until after the general election and he did not attempt to have his name stricken after his death. The reasoning of the court in *Wickersham* is applicable here as the court held that all objections should be resolved as early as possible and certainly prior to the election. Speaking of the necessity of compliance with the statutory provision for challenging eligibility of a candidate at the Election Board before the election is held, the court observed at page 424 that our "construction is also in keeping with the proposition that the right to contest an election may be lost by laches or inexcusable delay. [citations omitted] We note that petitioner does not here claim that he did not know or by the exercise of reasonable diligence could not have learned long before the General Election was held of the facts which he now asserts disqualified Wheeler."

Petitioner's attacks on Judge Ogden's candidacy were not asserted with the requisite diligence. As discussed above, petitioner's delay was unreasonable and the relief sought is barred by laches.

Having held that the petitioner's attack on the right of deceased, Ogden, to be on the ballot is barred by laches, we next turn to the central issue in the case: What effect is to be given the votes of 91% of the voters who cast their ballots for the deceased incumbent with apparent knowledge that he was dead. Again, our statutes are silent. We have a statutory provision, 26 O.S.1981, § 1–105, which provides for the substitution of a political party's nominee for office following the death of a nominee before the general election. However this statute has no application in the case before us because judges are elected on a non-partisan ballot. We have no statute which addresses a situation where a judge who filed properly for an office dies before the general election. We are, therefore, addressing a case of first impression in this state.

Evans contends that the votes cast for Ogden were void and cannot be counted for any purpose. This is particularly true, Evans argues, because the voters were aware that Ogden was dead and they intentionally voted for Ogden to create a vacancy in the office to be filled later by appointment, and there is no legal Oklahoma procedure by which a voter may vote for a yet unknown party who will be named at a later date. In addition to more general authority, Evans argues that it is impossible to determine the voter's "choice of candidate" within the meaning of 26 O.S.1981, § 7–127(7) [4] and the votes cast for Judge Ogden should be declared void. That statute is not applicable to this situation in any respect, however. It concerns mismarked or improperly marked ballots. Here the voters' choice of candidates is easily discerned: 91% of them voted for Frank Ogden.

Petitioner contends that because he received the highest number of votes cast

---

4. 26 O.S.Supp.1983, § 7–127 states in pertinent part:
    "The following rules shall govern the counting and recounting of votes:
        \*    \*    \*    \*    \*    \*
    Any ballot or part of a ballot on which it is impossible to determine the voter's choice of candidate shall be void as to the candidate or candidates thereby affected."

for a *living* person for the office of district judge he should be declared the winner of the election. He argues that because of the absolute incapability of Judge Ogden to come within the definition of a person who is a qualified elector capable of meeting the statutory and constitutional requirements for district judge, that the expressions of the voters in voting a dead man into office must be treated as a nullity. There are cases within the United States which have so viewed this situation. Evans relies primarily on *State ex rel. Wolff v. Geurkind,* 111 Mont. 417, 109 P.2d 1094 (1941), which involved similar facts. Wolff and Gallagher were candidates for the district Court Clerk's office and Gallagher died several days before the election. After his death a concerted effort was made to notify voters of his death and urge them to vote for the deceased with a view toward leaving a vacancy in the office to be filled by appointment. Gallager received the overwhelming majority of votes and the court declared Wolff to be the winner of the election as having received the highest number of votes cast for a "person", stating at 109 P.2d at 1099:

> "It is our opinion that a voter at the polls unless he votes for some person is not voting at all. A ballot cast, which does not express the preference of the voter for some person to fill the office is a nullity, cannot be counted and cannot be given any effect in determining the result of the election, as to that office ... One who has died is no longer a person. He has ceased to exist. He can no longer function in any capacity in the affairs of the world ... Therefore, the votes cast for J.P. Gallagher * * * were not cast for anyone; they were not votes cast for any person ... all of the 400 votes so cast were an absolute nullity and can have no effect on the result of the election."

Similar reasoning and language are found in the other authorities cited by petitioner: *Blaine v. Bd. of Supervisors of Alameda County,* 1 Cal.2d 486, 35 P.2d 517 (1934); and *Bowring v. Dominques,* 3 Cal.2d 167, 44 P.2d 299 (1935). These cases are representative of the minority view, called the English rule, which holds that a ballot should not be counted for a candidate known to be ineligible as that candidate is not capable of being selected, and that a vote knowingly so cast for one ineligible or who has died is thrown away. It is seen as deliberately wasted vote which should not be counted in the determination of the outcome of the election.

We believe that the better rule is the majority view, called the American rule. According to this view, the voter's knowledge of the death of disqualification of the candidate is not material and that vote is not to be treated as void or thrown away but to be counted in determining the result of the election as regards to the other candidates. Under this view the election is rendered nugatory since the candidate receiving the highest number of votes is deceased or disqualified and the resulting vacancy must be filled according to law.

We are impressed, as was the court in *State, ex rel., Jackson v. County Court of McDowell County,* 152 W.Va. 795, 166 S.E.2d 554 (1969), by the sound criticism the English rule has received in this country based upon its lack of reason, justice, and logic and also due to the practical difficulties involved in the rule's application. Proving knowledge on the part of the voters is of course difficult and would be enhanced or diminished by the geographical size of the area involved in the voting. Also, in accord with the majority rule, there is sound basis to hold that persons who voted for a candidate knowing that he was dead were voting against the other candidate and voting for the creation of a vacancy in the office so that this vacancy might later be filled in the manner set out by law.

We agree with the conclusion of the court in *Petition of Keogh–Dwyer,* 106 N.J.Super. 567, 256 A.2d 314 (1969), that regardless of any theory of negative voting, votes for a dead candidate are an affirmative vote for a vacancy in preference to a named and living candidate. In this way the electorate has a choice, even though it may be for a candidate then unknown. The court noted that to accept

the minority view propounded there, as in the instant case, that votes for the deceased candidate were null would deprive the electorate of any choice upon the death of one candidate. This alone was sufficient in the court's estimation to rebut any good reason for the English rule's treatment of votes for a deceased candidate as void where they are cast by voters with knowledge of the death. The court observed, correctly in our view, that "the greater the knowledge, the more advised the vote, and the more sound the expression of the popular will." 256 A.2d at p. 318.

The English rule applied to such a situation would result in the election of a candidate who received far fewer votes and would thwart the popular will. The most basic principle of our form of democratic government is that the will of the majority shall prevail in an election and that no candidate or measure can be declared elected without receiving a majority of the votes cast.

In a comprehensive annotation "Elections–Dead or Disqualified Candidate", at 133 A.L.R. 319, 321, the following concise statement of the American rule appears:

> "The general rule—that votes cast for a deceased, disqualified, or ineligible person are not be treated as void or thrown away, but are to be counted in determining the result of the election as regards the other candidates—has been most frequently applied in cases where the highest number of votes were cast for the deceased or disqualified person. The result of its application in such cases is to render the election nugatory, and to prevent the election of the person receiving the next highest number of votes. The rule has been applied, or recognized as applicable, under such circumstances, in the following cases: ..."

The annotation then cites cases from 28 states, Puerto Rico, England, Australia and Canada. The reason for the rule is then set forth in the following from the Supreme Court of California in 1859, in *Saunders v. Haynes*, 13 Cal. 145, where that court stated:

> "*An election is the deliberate choice of a majority or plurality of the electoral body. This is evidenced by the votes of the electors.* But, if a majority of those voting, by mistake of law or fact, happen to cast their votes upon an ineligible candidate, it by no means follows that the next to him on the poll should receive the office. If this be so, a candidate might be elected who received only a small portion of the votes and who never could have been elected at all but for this mistake. The votes are not less legal votes because given to a person in whose behalf they cannot be counted; and the person who is the next to him on the list of candidates does not receive a plurality of votes because his competitor was ineligible. The votes cast for the latter, it is true, cannot be counted for him; but that is no reason why they should, in effect, be counted for the former, who, possibly, could never have received them. *It is fairer, more just and more consistent with the theory of our institutions, to hold the votes so cast as merely ineffectual for the purpose of an election, than to give them the effect of disappointing the popular will, and electing to office a man whose pretensions the people had designed to reject.*" (Emphasis added)

We are persuaded by the similar philosophy of *Derringe v. Donovan*, 308 Pa. 469, 162 A. 439 (1932), where the candidate for school director who received the most votes died six days before the election. In holding that a vacancy was created by his death and that the next highest candidate was not declared elected, the court stated at 162 A. at 441:

> "To hold that the votes cast for a contemporaneously or recently deceased winning candidate for Governor or United States Senator or Congressman or school director shall be regarded as nullities, and that his opponent who was voted for by only a minority of the voters is in fact elected, because he receives the highest vote among the candidates who are alive at the time of closing of the polls, is repugnant to the principle of majority rule, which is the cornerstone of

orderly government. The principles of popular government require that votes cast for a dead man as a candidate for public office shall not be considered mere nullities, but that they shall be regarded as expressions by the voters that they prefer the office to be declared temporarily vacant until it can be filled in the manner prescribed by law rather than that a person whom they voted against and who represents opposing policies should fill it for a full term."

See also: *Ingersoll v. Lamb*, 75 Nev. 1, 333 P.2d 982 (1959); *Tellez v. Superior Court in and for County of Pima*, 104 Ariz. 169, 450 P.2d 106 (1969); *Highton v. Musto*, 186 N.J.Super. 281, 452 A.2d 487 (L.1982); *Banks v. Zippert*, 470 So.2d 1147 (Ala. 1985).

It is beyond question that the will of the electorate was to cast votes for Judge Ogden and against candidate Evans. Those who voted for Judge Ogden with knowledge of his death were casting votes against a living candidate and for the creation of a vacancy in the office. It would not serve any policy of the law to disenfranchise those voters by disregarding their will and holding their votes in favor of Judge Ogden null and void and declaring Evans the successful candidate simply because he is the only living candidate. The majority of the voters have cast their votes in favor of Judge Ogden and they are entitled to have those votes counted as they intended them to be. Due to the death of Judge Ogden a vacancy exists in the office which shall be filled in the manner prescribed by law.

We view the American Rule applicable here and in any situation where there is an absence of statutory authority to remove the candidate's name from the ballot before the election.

All relief is denied petitioner.

All the Justices concur.