921 P.2d 495 (1996)
129 Wash.2d 697
The STATE of Washington, Respondent,
v.
Paul RIVERS, Appellant.
No. 63412-2.
Supreme Court of Washington, En Banc.
Argued January 16, 1996.
Decided August 8, 1996.
Reconsideration Denied October 24, 1996.
*496 Washington Appellate Project, Richard Tassano, Seattle, for appellant.
Norm Maleng, King County Prosecutor, Robin Fox, Deputy, Seattle, for respondent.
GUY, Justice.
Defendant Paul Rivers challenges both his underlying conviction for second degree robbery and the constitutionality of the Persistent Offender Accountability Act, the statute under which he was sentenced to life imprisonment without possibility of parole. We affirm the conviction and the sentence.

Facts
On December 20, 1993, less than three weeks after Washington's Persistent Offender Accountability Act went into effect, Defendant *497 Paul Rivers was arrested for the robbery of an espresso bar employee in the University District of Seattle.
The victim of the robbery, Josef Slobodzian, testified that in December 1993, he worked at a walk-up espresso bar in Seattle's University District. On the evening of December 20, 1993, Mr. Slobodzian closed the espresso bar about 9 p.m. He counted the cash and put it and a bank deposit slip into a bank bag. Mr. Slobodzian set the bank bag on the outside counter of the espresso bar while he brought the tables and chairs inside. He testified that he saw a man wearing a tan trench coat walk by and that he looked out to make sure the bank bag was still on the counter.
Mr. Slobodzian then took the bank bag, containing approximately $340, and began walking toward the bank. While he was stopped for a traffic light at an intersection, the man in the tan trench coat approached him, chatted for a moment and then said, "I have a gun, give me the bank bag." The two men struggled over the bag for a short time before the robber grabbed the bag and ran. Mr. Slobodzian chased the robber until he turned into an alley where the robber then turned and said, "I'll blow your head off. It is not worth your life." The man had his hand in his left pocket and was pointing something at him that Mr. Slobodzian believed to be a gun. Mr. Slobodzian abandoned his chase and called the police.
A description of the robber was broadcast over the police radio and was heard by two officers who had talked with Defendant Rivers and his girlfriend earlier that day about a different matter. The officers stated that at the time of the earlier contact Defendant Rivers had been wearing a tan trench coat and that he otherwise matched the description of the robber. The officers drove near the house where the Defendant had been staying. They saw the Defendant's girlfriend walk across the alley, put something into a garbage can and walk quickly back to the house. The officers retrieved the espresso bar's bank bag from the garbage can. The bag had been slit open and contained no cash but still contained the deposit slip.
The officers then went to the Defendant's house where they found Defendant Rivers hiding underneath a mattress in a bedroom. The Defendant and the bank bag were separately brought outside to where Mr. Slobodzian was located. Both the bag and the Defendant were identified at that time by Mr. Slobodzian.
Defendant Rivers was arrested. He had $254.31 in cash on his person. The Defendant first told a police officer that his girlfriend had given him the money and that he did not know where she got it. He later claimed the money came from a check that he had cashed. At trial the Defendant testified that he took the money from the espresso bar when Mr. Slobodzian was not looking. No gun was found.
He was charged on December 23, 1993, with robbery in the second degree. On February 7, 1994, the State filed a "Notice of Intent to File Persistent Offender Allegation."
Defendant Rivers was the only witness to testify for the defense about the circumstances of the robbery. He testified that he had been staying with a friend in the house where he was arrested, across the street from the espresso bar. He said his friend went to the espresso bar frequently and that he himself had gone there and had talked with Mr. Slobodzian more than once. He testified that he had heard from a friend that Mr. Slobodzian wanted some marijuana and that he attempted to sell marijuana to Mr. Slobodzian. He testified that Mr. Slobodzian told him that he was short on money but could pay him in a couple of days. The Defendant said he believed Mr. Slobodzian owned the espresso shop, so he sold Mr. Slobodzian marijuana on credit. He testified that he asked Mr. Slobodzian for the money due, but Mr. Slobodzian kept putting him off.
Defendant Rivers testified that he went to the espresso bar on the evening of December 20, 1993, and that Mr. Slobodzian again told him that he did not have the money that was owed to the Defendant. The Defendant said he had seen Mr. Slobodzian place the money sack on the counter right by the door and when Mr. Slobodzian had his back turned, the Defendant took the bank bag, put it *498 under his coat, and said goodbye. About 20 minutes later, the police came to his home and arrested him.
At trial the State was permitted to use three prior felony convictions in its attempt to impeach the Defendant's testimony. The State also was allowed to question the Defendant about a statement made by his lawyer during opening statements. Further, the State was permitted to ask one of its witnesses, a police officer, whether the person shown in exhibit 6, a booking photograph dated December 21, 1993, was the Defendant. These three actions are challenged on appeal.
The jury returned a verdict of guilty on the robbery charge.
A second jury found Defendant Rivers to have three convictions of "most serious offenses." This finding is not challenged on appeal. The trial judge then sentenced the Defendant to life imprisonment without possibility of parole, under the terms of the Persistent Offender Accountability Act. Laws of 1994, ch. 1 (Initiative 593, approved November 2, 1993), amending the Sentencing Reform Act of 1981, RCW 9.94A.
Defendant Rivers appealed his conviction and his sentence. We ordered this case transferred to this court for argument and set it as a companion case with State v. Manussier, 129 Wash.2d 652, 921 P.2d 473 (1996), and State v. Thorne, 129 Wash.2d 736, 921 P.2d 514 (1996).

Issues
1. Did the trial court err in permitting the State to use a prior assault conviction to impeach the credibility of the Defendant?
2. Did the trial court err in permitting the State to cross examine the Defendant on statements made by defense counsel during opening statement?
3. Did the trial court err in admitting a photograph taken of the Defendant at the time he was arrested on the predicate crime?
4. Did application of the Persistent Offender Accountability Act in this case violate the federal and state constitutional rights of the Defendant?

Decision
Prior Convictions. The trial court permitted the use of three prior convictions in the State's attempt to impeach Defendant Rivers' testimony. The Defendant's prior convictions were a 1985 conviction for attempted robbery in the second degree, a 1987 conviction for robbery in the second degree, and a 1990 conviction for second degree assault. Because of the closeness in nature to the predicate charge, the trial court ruled that the State could offer the prior convictions only as unnamed felonies.[1]
Evidence of prior convictions may be admissible for the purpose of attacking the credibility of a witness, including a defendant in a criminal case, under ER 609. Rulings made under ER 609 are reviewed under an abuse of discretion standard. State v. King, 75 Wash.App. 899, 910 n. 5, 878 P.2d 466 (1994), review denied, 125 Wash.2d 1021, 890 P.2d 463 (1995).
ER 609(a) states:
For the purpose of attacking the credibility of a witness in a criminal or civil case, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during examination of the witness but only if the crime (1) was punishable by death or imprisonment in excess of 1 year under the law under which the witness was convicted, and the court determines that the probative value of admitting this evidence outweighs the prejudice to the party against whom the evidence is offered, or (2) involved dishonesty or false statement, regardless of the punishment.
Two of Defendant Rivers' prior crimes, robbery and attempted robbery, involved dishonesty and therefore were per se admissible for impeachment purposes under ER 609(a)(2). State v. Ray, 116 Wash.2d *499 531, 545, 806 P.2d 1220 (1991) (crimes of theft involve dishonesty and are per se admissible); State v. Schroeder, 67 Wash.App. 110, 115, 834 P.2d 105 (1992).
It is only the admission of the 1990 conviction for assault that is claimed to have constituted error in this case. Defendant Rivers claims the trial court abused its discretion in failing to consider, on the record, the factors which favored admission or exclusion of the prior conviction.
In State v. Alexis, 95 Wash.2d 15, 19, 621 P.2d 1269 (1980) this court held that a trial court exercising its discretion under ER 609(a)(1) must not only weigh the prejudicial effect of the prior conviction against the probative value of the evidence but must additionally consider and weigh the following factors:
(1) the length of the defendant's criminal record; (2) remoteness of the prior conviction; (3) nature of the prior crime; (4) the age and circumstances of the defendant; (5) centrality of the credibility issue; and (6) the impeachment value of the prior crime.
In exercising its discretion, the trial court is required to follow the balancing procedure in a meaningful way. Further, the trial court must articulate, for the record, the factors which favor admission or exclusion of prior conviction evidence under ER 609(a)(1). State v. Jones, 101 Wash.2d 113, 122, 677 P.2d 131 (1984), overruled on other grounds by State v. Brown, 111 Wash.2d 124, 761 P.2d 588 (1988), adhered to on reh'g, 113 Wash.2d 520, 782 P.2d 1013, 80 A.L.R.4th 989, corrected, 787 P.2d 906 (1990); State v. Gomez, 75 Wash.App. 648, 651, 880 P.2d 65 (1994).
The responsibility of the trial court to state the factors considered under the Alexis test for the record is mandatory. Jones, 101 Wash.2d at 122, 677 P.2d 131; Gomez, 75 Wash.App. at 651, 880 P.2d 65. Failure to engage in this process on the record is an abuse of discretion. Jones, at 122-23, 677 P.2d 131. Admission of a felony as "unnamed" is not a substitute for the balancing process required under Alexis. Gomez, 75 Wash.App. at 655, 880 P.2d 65.
Although the trial court was aware of Defendant Rivers' prior criminal history, and the nature and dates of prior convictions, the court did not complete the required analysis of the Alexis factors on the record. Its failure to do so constituted an abuse of discretion. Jones, 101 Wash.2d at 122-23, 677 P.2d 131; Gomez, 75 Wash.App. at 656 n. 11, 880 P.2d 65.
An erroneous ruling under ER 609(a) is reviewed under the nonconstitutional harmless error standard. Ray, 116 Wash.2d at 546, 806 P.2d 1220. Thus an erroneous ER 609 ruling is not reversible error unless the court determines that `"within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" Ray, 116 Wash.2d at 546, 806 P.2d 1220 (quoting State v. Smith, 106 Wash.2d 772, 780, 725 P.2d 951 (1986)); Gomez, 75 Wash.App. at 657, 880 P.2d 65.
We hold here that the error was harmless. Had the evidence of the third felony not been before the jury, the outcome of the trial would, in all likelihood, have been the same, i.e., conviction for second degree robbery. First, the testimony offered on behalf of the State showed consistent statements were made by the victim over a period of time with respect to the circumstances of the crime, and several inconsistent statements regarding the incident were made by the Defendant. Second, the Defendant claimed to have talked with the victim a number of times before the date of the crime charged and to have arranged a drug transaction for him through a third person, but the Defendant offered no corroborating testimony even about the occasional legal contacts. Third, the Defendant's own testimony showed a criminal history. He admitted that he stole the money from the victim but denied taking it by force. He stated that he hid from police just prior to his arrest because he believed he had outstanding warrants issued against him. He testified that he had had contact with the police on two other occasions the week of the crime charged, and he testified that he had sold drugs on a number of occasions. Fourth, the State had a per se right to impeach the Defendant's testimony with the prior convictions for robbery and *500 attempted robbery, but the trial court tempered the prejudicial effect of those crimes by restricting the evidence to "unnamed" felonies. Fifth, the trial court instructed the jury that evidence of prior convictions was not evidence of the Defendant's guilt and could be considered only in deciding what weight or credibility should be given to the Defendant's testimony.
Based on the other evidence before the jury, we are able to conclude within a reasonable probability that the outcome of the trial was not materially affected by the erroneous admission of evidence that the Defendant was convicted of a third unnamed felony. Therefore, the error was harmless.
Cross Examination of Defendant. Defendant Rivers claims the trial court abused its discretion by permitting irrelevant evidence to be admitted during cross examination of the Defendant. The Defendant argues that the State should not have been allowed to cross-examine him about statements made by his counsel during the opening statement.
During the opening statement, defense counsel made the following statement:
Back on December 20th, this man here, Paul Rivers, didn't rob anybodynot Joseph Slobodzian or anyone.
. . . .
In identifying Mr. Rivers, you will find that what the officers did was take Mr. Slobodzian to a house, show him the bank bag which had been taken, said essentially we found the bank bag in the house, bring Mr. Rivers out in handcuffs, the only African American there, the only guy not in a police uniform, brought him out in front of the house, shined a spotlight on him, said Mr. Slobodzian, do you see anybody who can be a suspect.
Now, every lawyer dreams of getting a case like this, based on a shaky ID....
Clerk's Papers at 364-65.
During cross examination, the following occurred:
Q. [By Prosecutor] Now, you were sitting through opening statement; is that correct?
A. [By Defendant Rivers] I was.
Q. And you heard your attorney make some reference to the jurors that identity was an issue in this case; is that correct?
[Defense Counsel]: I object to that, Your Honor.
THE COURT: Overruled.
Q. [By Prosecutor] That identity was an issue in this case; is that correct?
A. That's correct.
Q. But identity is not the issue in this case, is it?
A. Just as I told you in my statement, the investigation.
Q. You were the person that took the money?
A. Yes, from the espresso.
Report of Proceedings at 410-11.
Defendant Rivers argues that this cross examination was improper because statements made by counsel are not evidence and that a defendant's interpretation of those arguments is irrelevant and inadmissible.
The State counters that where contradictory or inconsistent statements are made by a defendant (through counsel) in opening argument and in a defendant's testimony, the statements are admissible for impeachment or to discredit the defendant's case. See State v. Dault, 19 Wash.App. 709, 718-19, 578 P.2d 43 (1978) (attorney's statement at an omnibus hearing regarding the general nature of the defense to the crime charged was admissible on cross examination of defendant to discredit and impeach defendant's testimony).
All relevant evidence is admissible; evidence which is not relevant is not admissible. ER 402. Evidentiary rulings on admissibility under ER 402, as well as under ER 611 (governing cross examination), are reviewed for abuse of discretion. Radford v. City of Hoquiam, 54 Wash.App. 351, 354, 773 P.2d 861 (1989); State v. Young, 89 Wash.2d 613, 628, 574 P.2d 1171, cert. denied, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978).
Relevant evidence
means evidence having any tendency to make the existence of any fact that is of *501 consequence to the determination of the action more probable or less probable than it would be without the evidence.
ER 401.
Defendant Rivers was present when his attorney, in opening statement, explained to the jury that this was a case of mistaken identity. See Dault, 19 Wash.App. at 718, 578 P.2d 43. The admission by Defendant Rivers that he took the money from the espresso bar contradicts his counsel's statement. The trial court did not abuse its discretion in allowing cross examination of the Defendant about his counsel's opening statement under the facts of this case. The examination was relevant to the extent that it would assist the jury by clarifying the nature of the defense to the crime charged.
Booking Photograph. During the course of the trial, and after opening statements, the Defendant moved to exclude exhibit 6, which is a booking photograph taken of Defendant Rivers on December 21, 1993, after he was arrested. The Defendant argued that the photograph was irrelevant and unduly prejudicial and thus inadmissible under ER 402 and ER 403.
As stated above, ER 401 defines relevant evidence as evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Relevant evidence is admissible, ER 402, but may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. ER 403. A trial judge has wide discretion in balancing the probative value of evidence against its potentially prejudicial impact. State v. Coe, 101 Wash.2d 772, 782, 684 P.2d 668 (1984).
Defendant Rivers objected to the admission of the photograph, arguing it was irrelevant because identity was not an issue at trial. With respect to relevancy, the trial court stated:
You did indicate in your opening statement that there was some kind of suggestive identification of the defendant by the victim in this case, or the alleged victim. And in this respect, the hairstyle of the defendant is a little bit different than that which he is presently exhibiting....
In this respect, identification in some way is going to be an issue, as such. Your opening statement indicated that he was spotlighted by the police and the victim made an identification. He was the only black man in the area. So identification is, in a sense, an issue to some degree. And in that respect, it is probative.
Report of Proceedings at 275.
The trial court also found that the exhibit was not unfairly prejudicial. The court stated:
This is a booking photo, is my understanding.
This indicates date of photo, 12/21/93, the day after this incident. At this point he must have been arrested.
I don't think that that is prejudicial, the fact that he has been arrested and the fact that they have [a] regular booking procedure.
Report of Proceedings at 273.
Based on the trial court's ruling, the State asked one of the arresting officers if he could identify exhibit 6. The testimony regarding the exhibit is the following:
[Witness:] That's Mr. Rivers, the photograph of him.
[Prosecutor:] And is that an accurate depiction of Mr. Rivers on December the 20th?
[Witness:] Yes.
Report of Proceedings at 330.
Although defense counsel argued to the court, outside the presence of the jury, that identity was not an issue in the case, counsel's remark in the opening statement that "every lawyer dreams of getting a case like this, based on a shaky ID" put the issue of proper identification before the jury.
Additionally, admission of the photograph was not unfairly prejudicial. The photograph was taken following the Defendant's arrest for the crime for which he was being tried and showed the date of the arrest. In State v. Newton, 42 Wash.App. 718, 726-27, 714 P.2d 684 (1986), rev'd on other grounds, *502 109 Wash.2d 69, 743 P.2d 254 (1987), a case relied on by the Defendant, the Court of Appeals held that a "mug shot" generally discloses the fact of an arrest and thus can be prejudicial. In Newton a "mug shot" from a prior crime was introduced into evidence to show the process of identifying the defendant. The Court of Appeals held that the prejudicial effect of the photograph in that case was minimal, and thus not reversible error, because the jury eventually learned of the defendant's prior convictions. Newton, 42 Wash.App. at 727, 714 P.2d 684.
Because Defendant Rivers raised the issue of identity during opening statements, the photograph of the Defendant on the day of the crime was relevant as it tended to show that the victim's description to police matched the man arrested shortly after the robbery. The admission of the photo was not prejudicial because the jury knew the Defendant was arrested for the crime on which he was being tried, and the jury would reasonably have been aware that a booking procedure, including photographing the Defendant, would have existed.
There was no error in the admission of the photograph.
Constitutionality of Persistent Offender Accountability Act. Defendant Rivers challenges the constitutionality of the Persistent Offender Accountability Act, the law under which he was sentenced.
In the companion case, State v. Thorne, we upheld the constitutionality of this act. The issues raised by Defendant Rivers with respect to any violation of equal protection, due process, separation of powers, and Article II, Sections 19 and 37 of this state's constitution are answered in Thorne.
Like defendant Thorne, Defendant Rivers argues his sentence violates the Eighth Amendment to the United States Constitution and Article I, Section 14 of this state's constitution. The Eighth Amendment to the United States Constitution bars cruel and unusual punishment. Article I, Section 14 of this state's constitution bars cruel punishment.
In State v. Fain, 94 Wash.2d 387, 617 P.2d 720 (1980), and in State v. Thorne, this court held the state constitutional provision barring cruel punishment is more protective than the Eighth Amendment. Because we hold that the sentence imposed upon Defendant Rivers under the Persistent Offender Accountability Act does not violate the more protective state constitutional guarantee against cruel punishment, we do not additionally examine the Defendant's claim under the Eighth Amendment.
Fain enunciated four factors to be considered in analyzing claims of cruel punishment. Those factors are: (1) the nature of the offense, (2) the legislative purpose behind the statute, (3) the punishment the defendant would have received in other jurisdictions, and (4) the punishment meted out for other offenses in the same jurisdiction. Fain, 94 Wash.2d at 397, 617 P.2d 720.
We considered these factors in Thorne and held that the Persistent Offender Accountability Act, as applied in that case, was not violative of Article I, Section 14. Thorne, at 772-777, 921 P.2d 514. After applying the Fain factors to Defendant Rivers' case, we reach the same conclusion.
The offense committed by Defendant Rivers is a "most serious offense" under the statute. RCW 9.94A.030(23). The nature of the crime of robbery includes the threat of violence against another person.[2] The crime *503 committed by Defendant Rivers involved a threat of violence toward another person and therefore is a far more serious offense than the second degree theft committed by the defendant in Fain.
The second factor which must be considered under Fain is the purpose behind the sentencing statute. We considered this factor in Thorne and held that the purposes of the persistent offender law include deterrence of criminals who commit three "most serious offenses" and the segregation of those criminals from the rest of society. Thorne, at 775, 921 P.2d 514.
The third Fain factor we consider is the punishment the Defendant would have received in other jurisdictions. Washington's so-called "three strikes" law is similar to state and federal legislation throughout much of the United States. See Peter J. Benekos & Alida V. Merlo, Three Strikes and You're Out!: The Political Sentencing Game, 59 Fed. Probation 3 (Mar.1995); Thomas R. Goots, Comment, "A Thug in Prison Cannot Shoot Your Sister": Ohio Appears Ready to Resurrect the Habitual Criminal Statute Will it Withstand an Eighth Amendment Challenge?, 28 Akron L.Rev. 253 (1995); Mark W. Owens, California's Three Strikes Law: Desperate Times Require Desperate MeasuresBut Will It Work?, 26 Pac. L.J. 881 (1995). It is likely Defendant Rivers would have received a similar, harsh sentence for his third serious offense under the majority of jurisdictions in this country. The penalties vary, but many include life sentences for three-time offenders. This court has held that the distinction between life sentences with and without parole is not significant. In re Grisby, 121 Wash.2d 419, 427, 853 P.2d 901 (1993).
The final Fain factor requires an analysis of the punishment Defendant Rivers might receive for other offenses in this jurisdiction. Under the Persistent Offender Accountability Act, all defendants who are convicted of a third "most serious offense" receive sentences of life imprisonment without possibility of parole. The offenses which are the basis for the convictions and sentence in this appeal are serious, violent offenses, which the people of this state have determined call for serious punishment. This court has previously held that a life sentence imposed upon a defendant who, after being convicted of robbery, was determined to be a habitual criminal was not cruel and unusual punishment. State v. Lee, 87 Wash.2d 932, 558 P.2d 236 (1976). The Lee court, at 937, held:
Appellant's sentence does not constitute cruel and unusual punishment. The life sentence contained in RCW 9.92.090 is not cumulative punishment for prior crimes. The repetition of criminal conduct aggravates the guilt of the last conviction and justifies a heavier penalty for the crime. Appellant's prior convictions were for robbery, two burglaries in the second degree, and assault in the second degree. He received the life sentence for the second robbery conviction. His punishment is not disproportionate to the underlying offense.
(Citations omitted). See also Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (holding a sentence of life imprisonment without possibility of parole for the crime of possessing cocaine did not violate the Eighth Amendment); Rummel v. Estelle, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980) (sentence of life imprisonment for three minor theft felonies did not constitute cruel and unusual punishment).
Based on a consideration of the Fain factors, we hold that the sentence of life imprisonment without possibility of parole is not grossly disproportionate to the offense committed in this case.
Affirmed.
DURHAM, C.J., and DOLLIVER, SMITH, ALEXANDER and TALMADGE, JJ., concur.
MADSEN, Justice, concurring.
I concur in the result because the King County prosecuting attorney in this case followed the time honored practice of filing a supplemental information alleging that the defendant is a persistent offender following his conviction for a most serious felony under the persistent offender accountability act, *504 former RCW 9.94A.030(25)(a),(b). See State v. Le Pitre, 54 Wash. 166, 169, 103 P. 27 (1909); State v. Furth, 5 Wash.2d 1, 10, 104 P.2d 925 (1940) (describing habitual criminal proceeding); State v. Ward, 123 Wash.2d 488, 513, 869 P.2d 1062 (1994) (describing habitual criminal proceeding). Further, the trial court afforded Mr. Rivers a jury trial as required under the Washington Constitution, art. I, § 21. See Furth, 5 Wash.2d at 18, 104 P.2d 925. The jury found the prior convictions, alleged by the State in support of its allegation, had been committed by the defendant. Based on the jury's verdict, the trial judge imposed the enhanced penalty of life in prison without the possibility of parole. The procedure followed in Mr. River's case is identical to that established in recidivist proceedings in this State over 90 years ago. See State v. Manussier, 129 Wash.2d 685, 921 P.2d 473 (1996) (Madsen, J., dissenting).
The King County prosecuting attorney is absolutely correct when he says:
Washington law establishes that sentence enhancement allegations must be formally pled, proved beyond a reasonable doubt and, unless the right is waived, proved to a jury.... Defendant Rivers enjoyed each of these constitutional protections.
Br. of Resp't at 37. See Manussier, 129 Wash.2d 685, 921 P.2d 473 (1996) (Madsen, J., dissenting).
JOHNSON, J., concurs.
SANDERS, Justice, dissenting.
An avidity to punish is always dangerous to liberty. It leads men to stretch, to misinterpret, and to misapply even the best of laws. He that would make his own liberty secure must guard even his enemy from oppression; for if he violates this duty he establishes a precedent that will reach to himself.[[1]]
As our state constitution absolutely prohibits "cruel punishment," Const. art. I, § 14, and "[t]he provisions of this Constitution are mandatory, unless by express words they are declared to be otherwise," Const. art. I, § 29, I conclude this statute strikes out as unconstitutionally cruel punishment when judged against fundamental principles. Const. art. I, § 32.
Fifty-one separate offenses are "strikes" under this statute. It incorporates the longest list of eligible felonies of any similar legislation found in any state of the union.[2] Michael G. Turner et al., "Three Strikes and You're Out" Legislation: A National Assessment, 59 Fed. Probation 16, 25 (Sept.1995).[3]
In most instances this statute also imposes a much more severe sentence than would be imposed in other states. Second degree robbery in Oregon receives a standard range punishment of 13 to 18 months. State v. Lee, 110 Or.App. 528, 530, 823 P.2d 445, review denied, 313 Or. 211, 830 P.2d 596 (1992). In states which factor in prior crimes to compound the sentence, the term is less than 10 years. A defendant convicted in Alaska of second degree robbery with two prior violent felonies receives a six year term with possibility of three of those years suspended. Solomon v. State, 730 P.2d 809, 810 (Alaska.Ct.App.1987). In New Mexico, anyone convicted of a third noncapital felony receives an extra four years on the sentence for the third felony. Although comparison of this sentence with other states which have adopted a three-strikes scheme after Washington's may not be appropriate (measuring Washington's against copies seems somewhat *505 circular), the particular features of the Washington three-strikes law rank it among the harshest in the country. Many of the states with a three-strikes law do not even include second degree robbery in the list of strikes. See Del.Code Ann. tit. 11, § 4214(b) (Michie 1995) (second degree robbery not a strike under Delaware three-strikes law).
Even California has avoided Washington's "avidity to punish" as the recent decision in People v. Superior Court of San Diego County (Jesus Romero), 13 Cal.4th 497, 53 Cal.Rptr.2d 789, 917 P.2d 628 (1996) attests. There the California Supreme Court recognized trial court discretion to avoid "three-strikes" sentencing where necessary to promote the interest of justice. But Washington's law permits no similar exception. Therefore, constitutional analysis of the three-strikes statute, to give it like treatment, must be as exacting and unyielding as the letter of the statute itself.
Washington's law is in the minority of three-strikes legislation in imposing a mandatory life sentence without possibility of parole. See People v. Campos, 43 Cal. App.4th 189, 45 Cal.Rptr.2d 706, 724 (Johnson, J., dissenting) (Alabama, Mississippi, Indiana, and South Carolina are the only three-strikes states in addition to Washington which impose life sentences without possibility of parole), review granted and opinion superseded by 48 Cal.Rptr.2d 896, 908 P.2d 422 (1995). Compare Cal.Penal Code § 667(a)-(i) (West 1996) (California three-strikes law, often considered amongst the country's harshest, mandates a sentence of 25 years to life for the third strike).
Sentences mandatorily imposed under this statute are disproportionate to maximum sentences under existing law in this State. For example, second degree robbery is a sentencing reform act (SRA) level four crime. RCW 9.94A.310(1). Of the 17 crimes in level four, only second degree robbery, assault two, and vehicular assault are strikes. Conviction of a level four crime with this defendant's record would earn a standard five to seven years, with early release available after two-thirds of the time is served. The maximum sentence is no more than 10 years.
However, for conviction of the third so-classified felony the sentence is uniformly life in prison without possibility of parole. The sentence is inevitable, not discretionary. It is the same for first degree murder as it is for second degree robbery of an espresso standcommitted with a finger in one's pocket to steal two or three hundred dollars.
The very core of the statute makes the particular circumstances of the individual defendant or his individual culpability for his specific crime simply irrelevant. Moreover, by denying even the possibility of parole, the statute makes potential post-sentencing rehabilitation, or lack thereof, equally irrelevant. The penalty is imposed without possibility of mercy expressly to defeat the discretion of any trial judge, or parole board, persuaded by fact and reason that mercy is appropriate to bring justice to the particular defendant.
Once sentenced to the penitentiary the defendant must there remain without possibility of release, without possibility of parole, without regard to rehabilitation, even without regard to his continued physical ability to re-offend. He is consigned to a cell, where he will remain until the paper upon which this opinion is written yellows with age. He will remain incarcerated hopelessly and endlessly beyond the time old age dims and ultimately erases that memory of the offense which brought him there in the first place.
As the Supreme Court has aptly observed, the sentence of life without possibility of parole is exceeded by only the death sentence itself, but not by much. Harmelin v. Michigan, 501 U.S. 957, 1028, 111 S.Ct. 2680, 2719, 115 L.Ed.2d 836 (1991) (Stevens, J., dissenting) ("[A] mandatory sentence of life imprisonment without the possibility of parole does share one important characteristic of a death sentence: The offender will never regain his freedom."). To some, the line between life without possibility of parole and execution is extremely delicate.[4] Mr. Rivers' *506 remaining life expectancy of 44 years[5] is his expectancy for the duration of his sentence, although not the maximum should he outlive the mortality table.
Article I, section 14, of the Washington State Constitution prohibiting "cruel punishment" was adopted in 1889. It has not been amended. It means the same now as it meant then. It was written for the ages and was intended to guide future generations. Lebbeus J. Knapp, The Origin of the Constitution of the State of Washington, 4 Wash. Historical Q. 227, 251 (Oct.1913) (hereinafter "Knapp"). Our constitution arose from a profound distrust of the Legislature and in large part was designed to strictly limit the Legislature. Knapp at 250 ("[O]f all oppressive and unjust instruments of government the legislature is the greatest and most irresponsible.").[6] The founders understood circumstances and political climates may change but principles and human nature do not.
Constitutions do not change with the varying tides of public opinion and desire. The will of the people therein recorded is the same inflexible law until changed by their own deliberative actions; and therefore the courts should never allow a change in public sentiment to influence them in giving a construction to a written Constitution not warranted by the intention of its founders. 6 R.C.L. 46
State ex rel. Banker v. Clausen, 142 Wash. 450, 454, 253 P. 805 (1927). See also State ex rel. O'Connell v. Slavin, 75 Wash.2d 554, 452 P.2d 943 (1969) (the court should never allow a change in public sentiment to influence it to give a construction to the written constitution not warranted by the intention of the founders); Boeing Aircraft Co. v. Reconstruction Fin. Corp., 25 Wash.2d 652, 171 P.2d 838, 168 A.L.R. 539 (1946) (the meaning of the state constitution was fixed at the time it was adopted and must be construed in the sense in which the framers understood it).
While most facial challenges to criminal sentencing statutes falter because one may not conclude as a matter of law that every punishment inflicted under the statute is necessarily cruel under every imaginable circumstance, see, e.g., State v. Fain, 94 Wash.2d 387, 390, 617 P.2d 720 (1980), it is just that statutory nullification of possible consideration of any particularized circumstance which weakens this statute to facial challenge. Compare In re Grant, 18 Cal.3d 1, 553 P.2d 590, 132 Cal.Rptr. 430 (1976) (California statute which precludes parole consideration for a minimum of 10 years for offenders with two or more prior convictions constitutes cruel or unusual punishment in violation of California constitution because constitutionality of punishment for crime requires consideration of individualized factors).
Even Washington's habitual offender law, RCW 9.92.090, which survived facial constitutional challenge in Fain, allowed individualized factors to be considered in the original sentence and for the purpose of post-sentence release. Imposition of a life sentence under the habitual offender law permitted parole at any time after the "inmate has demonstrated a meritorious effort in rehabilitation," RCW 9.95.040, and under that statute a life sentence could have meant actual incarceration for little more than a dozen years. Fain, 94 Wash.2d at 406, 617 P.2d 720 (Rosellini, J., dissenting).
While conceivable that but for the three-strikes statute an individual defendant might earn a life sentence never to be mitigated or *507 remitted because of individualized factors, consideration of those factors (or even proof thereof) is necessarily precluded by this statute. The statute's failing is on its face whereas the injustice of its application may not appear in the record precisely because of its operation.
The majority categorically rejects the prohibition on possible post-sentencing parole as even relevant. Parole is a post-sentencing remedy which further enables the system to account for and tailor the punishment based on post-sentencing experience with the particular offender. The United States Supreme Court has heavily relied upon the availability of parole when considering the issue of cruel and unusual punishment. Solem v. Helm, 463 U.S. 277, 300, 103 S.Ct. 3001, 3014-15, 77 L.Ed.2d 637 (1983) (distinguishing Rummel v. Estelle, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980)) ("Parole is a regular part of the rehabilitative process. Assuming good behavior, it is the normal expectation in the vast majority of cases.").
Does a statute which imposes life imprisonment without possibility of parole simply for the third conviction of a classified offense impose "cruel punishment" as the term is used in our state constitution? To answer this question we must yield to the constitutional imperative that we recur to fundamental principles. Const. art. I, § 32.
State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986) directs our inquiry:
The following nonexclusive neutral criteria are relevant in determining whether, in a given situation, the Washington State Constitution should be considered as extending broader rights to its citizens than the United States Constitution: (1) the textual language; (2) differences in the texts; (3) constitutional history; (4) preexisting state law; (5) structural differences; and (6) matters of particular state or local concern.
Gunwall, 106 Wash.2d at 58, 720 P.2d 808. This formulation has been criticized for placing too much emphasis on the United States Constitution as a starting point, see James W. Talbot, Rethinking Civil Liberties Under the Washington State Constitution, 66 Wash. L.Rev. 1099 (1991); however, it is helpful for present purposes. Cases decided without benefit of Gunwall scrutiny lack the precedential force which follows from this more thorough review. No prior Washington case has considered the constitutional prohibition against cruel punishment under a Gunwall analysis, nor does the majority here.

State Constitutional Text
What was the popular understanding of the words "cruel punishment" at the time the Washington Constitution was originally ratified? Robert F. Utter, Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights, 7 U. Puget Sound L.Rev. 491 (1984). Our territorial court summarized the standard for statutory construction in 1888; a standard which equally guides our constitutional inquiry today: "The ordinary use of words at the time when used, and the meaning adopted at that time, is usually the best guide for ascertaining legislative intent, as it is always the intent of any written instrument or law at the time it was made that is to govern in enforcing it. It is therefore well to inquire, in all cases, as to the meaning of words, and the force to be given them at the time when they were used...." Bloomer v. Todd, 3 Wash.Terr. 599, 615, 19 P. 135, 1 L.R.A. 111 (1888).

Cruel
At the time of ratification, cruelty was generally understood to encompass two elements: (1) punishment beyond that which is necessary and (2) absence of mercy. One dictionary defined "cruel" to mean "hard-hearted," "harsh," or "severe." Etymological Dictionary of the English Language (Oxford 1883). In another "cruelty" was the "unnecessary infliction of pain...." Henry Campbell Black, A Dictionary of Law 305 (1891). Accord Noah Webster, An American Dictionary of the English Language (1862) ("Cruelty[:].... giving unnecessary pain or distress to others."). A later dictionary, but not entirely remote, defined the term as "merciless" or "indifferent to ... another's pain." Oxford English Dictionary 431 (1st ed. 1933). Blackstone opined that "cruel" *508 in the context of the prohibition against cruel and unusual punishment meant severe or excessive. 5 St. George Tucker, Blackstone's Commentaries 15-17 (Rothman Reprints, Inc.1969) (1803).
In contrast, this statute permits no individualized consideration of necessity and absolutely forecloses even the possibility of mercy.[7]

Punishment
"Punishment" also had a deep meaning and profound implication to 19th Century Washingtonians. Appropriate punishment was understood to mean a proportional sentence as measured by factors relevant to the specific crime committed as well as the individual who committed it. This understanding permeated the legal culture of the time and was often expressed in natural law rhetoric.[8]
Since many involved in the Constitutional Convention of 1889 were attorneys, and the Constitutional Convention was led by accomplished jurists, it is safe to assume that these men were well versed in the natural law doctrines which were studied in law *509 schools of the day. Southcenter Joint Venture v. National Democratic Policy Comm., 113 Wash.2d 413, 423, 780 P.2d 1282 (1989). The draft constitution circulated on the first day of the Constitutional Convention, July 4, 1889, prepared by attorney W. Lair Hill, further evidenced this by frequently and expressly referencing the natural law origins of the constitution itself. W. Lair Hill, Proposed Constitution for the State of Washington, Portland Oregonian, July 4, 1889; cf. Knapp at 241.
All of this is especially important to the discussion at hand because the original, popular understanding of the term "cruel punishment" necessarily framed that understanding in a natural law context.[9] As Justice Utter notes, even the language of the preamble[10] evidences natural law background principles at work.[11]
Article I, section 32, lends further support for natural law implications found elsewhere in the Declaration of Rights[12] by mandating: "A frequent recurrence to fundamental principles is essential to the security of individual right and the perpetuity of free government." These "fundamental principles" incorporate natural law principles as well.[13] The framers of our constitution subscribed to notions of natural or fundamental rights when drafting the constitution, and "the notion of fundamental principles was central to natural law theories at the time [the constitution was adopted]." Southcenter, 113 Wash.2d at 438-39, 780 P.2d 1282 (Utter, J., concurring).[14]

Historical Principles of Legitimate Punishment
J.J. Burlamaqui's text, The Principles of Natural and Politic Law (7th London ed. *510 1859) was the leading natural law text of the period. Burlamaqui was among the most important natural law legal theorists from the American point of view.[15] He was widely read in law schools of the time. See, e.g., Hadley Arkes, The Return of George Sutherland Restoring a Jurisprudence of Natural Rights (Princeton Univ. Press, 1994).[16]
The Burlamaqui text was also frequently cited by the United States Supreme Court in the 19th Century. Chapter 11 of the Burlamaqui text, entitled "Right to Punish," defines cruelty as punishment imposed without due regard for the particular circumstances of the crime and the particular circumstances of the accused. This text embodies an influential explanation of the "fundamental principles" which are important to answer the question at hand.
In general, it is certain that the state never ought to inflict punishments but with a view to some public advantage. To make a man suffer merely because he has done a thing, and to attend only to what has passed, is a piece of cruelty condemned by reason; for, after all, it is impossible that the fact should be undone. In short, the right of punishing is a part of sovereignty; now sovereignty is founded ultimately on a beneficent power. It follows, therefore, that even when the chief ruler makes use of his power of the sword, he ought to aim at some advantage or future good, agreeably to what is required of him by the very nature and foundation of his authority.
J.J. Burlamaqui, The Principles of Natural and Politic Law at 276-77 (emphasis added).
Through the course of 40-numbered paragraphs, Burlamaqui sets forth those fundamental principles which distinguish beneficent from cruel punishments.
One accepted method to measure appropriate punishment was to individually calculate what is necessary to produce repentance. The punishment should be "of a different nature, according as it affects the life of a person, his body, his reputation, or his estate... [P]unishment is inflicted with a view to some good...." Id. at 274-75 (emphasis omitted). Punishment is to be measured "to balance the different degrees of human wickedness by a sufficient counterpoise." Id. at 275. The end of punishment was the safety of the public to be achieved through incarceration until reformation. However, continued punishment after reformation served no protective function and was therefore cruel.
[A]nd the state ought to use them all as means of obtaining that end; so that it should not have recourse to the most rigorous punishments, till those of greater lenity are insufficient to procure the public tranquillity.
Id. at 277-78.
Since the public good is the ultimate end of all punishment, Burlamaqui opined that when the public advantage might be best promoted through clemency or mercy, such is preferred to punishment.[17]
Burlamaqui cautioned against excess which, by its nature, was unnecessary to achieve the purpose. Excessive punishment was cruel because by definition unnecessary to achieve the legitimate end.[18]
*511 Other 19th Century scholars noted similar principles. Criminal punishment was said to have three key objectives: retribution, isolation of the offender, and reformation. Frederick Howard Weinz, Punishment and Reformation 287-89 (1895). The three-strikes statute serves the first two goals but not the third.
Discretion for post-sentence release prior to serving the maximum sentence was also an approved means to fit the punishment to the criminal. An international group of penologists formed in 1889 adopted as one of its canons that "the length of imprisonment must depend not only on the material and moral gravity of the offense, but on the results obtained by the treatment in prison." C. Bernaldo de Quiros, Modern Theories of Criminality 132-33 (Alfonso de Salvio trans., 1911). This entailed the notion that not only should a sentence be tailored to the crime and criminal but that reform and rehabilitation should allow for early release. See also Gerhard Mueller, Crime, Law, and the Scholars: A History of Scholarship in American Law 73-78 (1969) (discussing the rise in the late 19th Century of the penitentiary, parole, and judicial discretion in sentencing). Overall, these theories are well summarized as seeking to avoid unnecessary, merciless, and hard-hearted punishments cruel punishments.

Constitutional History of Proportionality
Proportionality has been part of the common law from the start. The Magna Charta devoted three chapters to enunciating the guarantees that fines, the dominant form of punishment of the time, could not be excessive. Solem v. Helm, 463 U.S. 277, 284-85, 103 S.Ct. 3001, 3006-07, 77 L.Ed.2d 637 (1983). When prison sentences became the routine criminal punishment, common law recognized that "imprisonment ought always to be according to the quality of the offence." Hodges v. Humkin, 2 Bulst. 139, 140, 80 Eng. Rep. 1015, 1016 (K.B.1615) (Croke, J., cited in Solem, 463 U.S. at 285, 103 S.Ct. at 3007). About the time our state constitution was adopted, Justice Field reflected a widely held view in his dissent that the Eighth Amendment prohibits "all punishments which by their excessive length or severity are greatly disproportionate to the offences charged." O'Neil v. State of Vermont, 144 U.S. 323, 339, 12 S.Ct. 693, 699, 36 L.Ed. 450 (1892) (Field, J., dissenting). Blackstone's Commentaries, widely regarded in the 19th Century, emphasized the importance of proportional punishments:
The laws of the Roman kings, and the twelve tables of the decemviri, were full of cruel punishments: the Porcian law, which exempted all citizens from sentence of death, silently abrogated them all. In this period the republic flourished: under the emperors severe punishments were revived; and then the empire fell.
It is moreover absurd and impolitic to apply the same punishment to crimes of different malignity ... It is a kind of quackery in government, and argues a want of solid skill, to apply the same universal remedy, the ultimum supplicium, to every case of difficulty.... It has been therefore ingeniously proposed, that in every state a scale of crimes should be formed, with a corresponding scale of punishments, descending from the greatest to the least: but, if that be too romantic an idea, yet at least a wise legislator will mark the principal divisions, and not assign penalties of the first degree to offences of an inferior rank. Where men see no distinction made in the nature and gradations of punishment, the generality will be led to conclude there is no distinction in the guilt. Thus in France the punishment of robbery, either with or without murder, is the same.... *512 5 St. George Tucker, Blackstone's Commentaries 17-18 (Rothman Reprints, Inc.1969) (1803) (footnotes omitted).[19]
The guiding principle of Western thought from that time to this has been that punishment should not only fit the crime but the criminal as well.[20]

Punishment Was Historically Judicial, Not Legislative, Function
The avoidance of cruel punishment was uniquely a judicial function since only the judiciary could apportion the punishment by individual factors, unlike the Legislature.
Burlamaqui also reflected the sentiment and practice of the day that individualized factors could be considered and applied only by the judiciary, not by legislative fiat:
Let us also observe, that it belongs to the justice and prudence of government always to follow the order of judgment and of the judiciary procedure in the infliction of punishments. This is necessary, not only that we may not commit injustice in an affair of such importance, but also that the state may be secured against all suspicion of injustice and partiality.
J.J. Burlamaqui, The Principles of Natural and Politic Law at 282.
This was the generally accepted practice in 19th Century Washington State as evidenced by the sentencing laws as they existed in 1889. For example, statutes set maximum punishments; however, judges retained discretion to impose a term fitting the facts of personal culpability and his specific crime within broad perimeters. The penalty for forcible rape was imprisonment for any term of years to be set by the judge up to life. (Code of Wash. 1881, § 812. Territorial laws given force of state law upon adoption of constitution, Const. art. 27, § 2 and codified in Hill's Penal Code § 28 (1891).) Robbery carried a penalty of 1 to 20 years, to be set by the judge. (Code of 1881, § 829. Territorial laws given force of state law upon adoption of constitution, Const. art. 27, § 2 and codified in Hill's Penal Code § 45 (1891).) The rationale behind the use of such broad ranges is summarized by an early case from this court: "the rule which is applicable in pronouncing sentence in all criminal cases [is that] the judge takes into consideration all the circumstances connected with the offense and makes the punishment fit the crime...." State v. Taylor, 142 Wash. 528, 529, 253 P. 796 (1927).
Additionally, the early code recognized the possibility of reform as evidenced by good behavior to permit early release. Code of Wash. 1896 § 1451.

Comparison of State to Federal Text
The fact that Washington's constitution prohibits sentences which are "cruel" without also requiring that they be "unusual" further suggests Washington's constitutional framers subscribed to the dominant penological views of the time that punishment should fit the specific crime and criminal while leaving open the hope and possibility of reform (without regard to the sentencing practices of others). "Cruel and unusual" is relative, defined by comparing it to others. Cruel without unusual, on the other hand, requires a more absolute definition.
Because it is conceded the state constitutional prohibition against cruel punishment includes but is broader than the federal prohibition against "cruel and unusual punishment," it is not necessary to dwell at length *513 upon the Eighth Amendment prohibition except to observe, axiomatically, that a punishment which violates the Eighth Amendment must necessarily violate article I, section 14, as well. Fain, 94 Wash.2d at 393, 617 P.2d 720. I do not reject the Eighth Amendment challenge, but do not reach it.
It is useful, however, to note that the fulcrum of federal debate on the subject rests on whether or not a disproportionate prison term may ever be "cruel and unusual" as those terms are used in the Eighth Amendment. Although it would appear a majority of the United States Supreme Court is presently of the mind that a disproportionate sentence must be "cruel and unusual" in principle, it is often unable to agree on specific application. Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991). However, even Justices Scalia and Rehnquist, of the minority view that proportionality never plays a role in the Eighth Amendment, concede "a disproportionate punishment can perhaps always be considered `cruel,' but it will not always be `unusual'" Harmelin, 501 U.S. at 967, 111 S.Ct. at 2687. Likewise, it is well settled in the jurisprudence of this State that a sentence must be proportional to pass state constitutional muster.
Fain purports to define the state constitutional prohibition against cruel punishment in terms of that standard set forth in Hart v. Coiner, 483 F.2d 136, 27 A.L.R.Fed. 93 (4th Cir.1973), cert. denied, 415 U.S. 938, 94 S.Ct. 1454, 39 L.Ed.2d 495 (1974). See Fain, 94 Wash.2d at 397, 617 P.2d 720.[21] Why this court adopted the Hart standard to measure the meaning of cruelty under our state constitution is left to the imagination. Hart was decided in a remote federal circuit more than 80 years after the state constitution was adopted, could not have been considered by the founders, and did not even purport to be a construction of this, or any other, state constitution. It was expressly an Eighth Amendment case and stressed whether the punishment was "unusual" rather than the nonrelative examination of "cruel." I do accept, however, the validity of Fain's factual observation about the history of this provision of the state Declaration of Rights:
Especially where the language of our constitution is different from the analogous federal provision, we are not bound to assume the framers intended an identical interpretation. The historical evidence reveals that the framers of Const. art. 1, § 14 were of the view that the word "cruel" sufficiently expressed their intent, and refused to adopt an amendment inserting the word "unusual". The Journal of the Washington State Constitutional Convention: 1889, at 501-02 (B. Rosenow ed. 1962).
Fain, 94 Wash.2d at 393, 617 P.2d 720.

Conclusion
The three-strikes law is a massive and radical departure from not only the practice but theory of criminal punishment in circa 1889 Washington. It applies the power of the state with uniformity to dissimilar general categories of crime. It does so expressly and intentionally without regard to those factors which traditionally were considered to insure the sentence is proportionately imposed. A disproportional sentence is cruel.
Moreover, the statute is severe, harsh, and merciless. Its punishment is imposed without regard to necessity. It is carried out without regard to rehabilitation or even possibility of re-offense. It is cruel for those reasons as well.
Cruelty does not promote legitimate governmental interests. This statute is unconstitutional on its face. It will inflict great and needless suffering absent judicial intervention to enforce the absolute constitutional prohibition against cruel punishment.
NOTES
[1] The practice of admitting prior convictions as generic or unnamed felonies has been approved by the appellate courts of this state as a device that can lessen the prejudicial impact of the evidence. See State v. Gomez, 75 Wash.App. 648, 655, 880 P.2d 65 (1994).
[2] RCW 9A.56.190 defines robbery as follows:

A person commits robbery when he unlawfully takes personal property from the person of another or in his presence against his will by the use or threatened use of immediate force, violence, or fear of injury to that person or his property or the person or property of anyone. Such force or fear must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking; in either of which cases the degree of force is immaterial. Such taking constitutes robbery whenever it appears that, although the taking was fully completed without the knowledge of the person from whom taken, such knowledge was prevented by the use of force or fear.
A person is guilty of robbery in the second degree, a class B felony, "if he commits robbery," RCW 9A.56.210, i.e., he commits robbery without inflicting bodily injury, or without being armed with a deadly weapon or displaying what appears to be a deadly weapon. RCW 9A.56.200 (robbery in the first degree).
[1] Thomas Paine, Dissertation on First Principles of Government, in Common Sense and Other Political Writings, Thomas Paine 174 (W.F. Adkins ed. 1953 (1776)).
[2] See, e.g., N.M. Stat. Ann. § 31-18-23(E)(2) (Michie 1994) (New Mexico has six crimes constituting "strikes": murder one, murder two, shooting from or at a motor vehicle resulting in great bodily harm, kidnapping resulting in great bodily harm, criminal sexual penetration, and robbery while armed with a deadly weapon resulting in great bodily harm).
[3] Every class B felony is a strike when committed with sexual motivation. Burglary of a pair of shoes to fulfill a sexual fantasy would therefore be a strike, as would a panty raid. RCW 9A.52.030; 9.94A.030(23)(s). Class B felonies are otherwise punishable by a maximum of 10 years. RCW 9A.20.020(1)(b). Some class C felonies are also strikes (second degree manslaughter (RCW 9.94A.030(23)(1)), third degree rape (RCW 9.94A.030(23)(n)), vehicular assault (RCW 9.94A.030(23)(q)) otherwise punishable by a maximum of five years (RCW 9A.20.020(1)(c)).
[4] See Professor Shigemitsu Dando, Toward the Abolition of the Death Penalty, Condon-Falknor Distinguished Lecture at University of Washington School of Law (unpublished) (Apr. 8, 1996).
[5] 6 Washington Practice: WPI App. B, Life Expectancy Table 702 (3d ed. 1989). Rivers' date of birth is October 5, 1964.
[6] The three-strikes statute was adopted by popular initiative; however, I do not find this distinction determinative, as direct action by a popular majority has its own pitfalls. See Lucas v. Forty-Fourth General Assembly, 377 U.S. 713, 736-37, 84 S.Ct. 1459, 1474, 12 L.Ed.2d 632 (1964) ("A citizen's constitutional rights can hardly be infringed simply because a majority of all the people choose that it be."). James Madison warned against "the superior force of an interested and overbearing majority ... [acting on] some common influence of passion." The Federalist No. 10 (James Madison) 77 (Clinton Rossiter ed., 1961). See also The Federalist No. 51 (James Madison) (Clinton Rossiter ed., 1961) and Madison's speech to Philadelphia convention quoted in Hans A. Linde, Who is Responsible for Republican Government, 65 U. Colo. L.Rev. 709, 719-20 (1994). See generally Marc Slonim & James H. Lowe, Comment, Judicial Review of Laws Enacted by Popular Vote, 55 Wash. L.Rev. 175 (1979).
[7] Compare dissenting opinion of Justice Madsen in State v. Manussier, 129 Wash.2d 652, 921 P.2d 473 (1996), which emphasizes not even the prosecutor can exercise mercy through discretion not to charge, as per the majority. Compare also the prosecutorial discretion not to charge under the habitual offender statute based on individualized factors. State v. Lee, 87 Wash.2d 932, 934-35, 558 P.2d 236 (1976) (less than one percent of eligible convicts were charged). Lee, 87 Wash.2d at 940, 558 P.2d 236 (Rosellini, J., dissenting). And compare People v. Superior Court of San Diego County (Jesus Romero), 13 Cal.4th 497, 53 Cal.Rptr.2d 789, 917 P.2d 628 (1996) (No. S045097) (if necessary to promote the interests of justice a California prosecutor need not charge a violation of the California three-strikes statute and the California judge retains discretion not to sentence according to that statute).
[8] Our court has frequently referenced background natural law principles in its opinions. See, e.g., Rettkowski v. Department of Ecology, 122 Wash.2d 219, 239, 858 P.2d 232 (1993) (Guy, J., dissenting) (access to air, running water, sea, and seashore are by natural law common to all); Farnam v. CRISTA Ministries, 116 Wash.2d 659, 686, 807 P.2d 830 (1991) (Dore, C.J., concurring in part, dissenting in part) (removal of nutrition and hydration flies in the face of natural law); Aetna Life Ins. Co. v. Bunt, 110 Wash.2d 368, 369, 754 P.2d 993 (1988) (the duty of parents to provide support for their minor children is a principle of natural law); In re Guardianship Grant, 109 Wash.2d 545, 580, 747 P.2d 445 (1987) (Goodloe, J., dissenting) (sanctity of human life is natural law principle which leads back through John Marshall, to Edmond Burke, Henry de Bracton, and even beyond the Magna Charta to Judean law), amended by 757 P.2d 534 (1988); Vergeyle v. Employment Security Dep't, 28 Wash.App. 399, 404, 623 P.2d 736 (equality of treatment may be natural law principle), review denied, 95 Wash.2d 1021 (1981), overruled on other grounds by Davis v. Department of Employment Security, 108 Wash.2d 272, 737 P.2d 1262 (1987); Stack v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co., 94 Wash.2d 155, 161, 615 P.2d 457 (1980) (tactic used by railroads to discourage injured employees from engaging in litigation interferes with natural law rights of each employee as a human being); Mead Sch. Dist. v. Mead Educ. Ass'n, 85 Wash.2d 278, 290, 534 P.2d 561 (1975) (Finley, J., concurring in part, dissenting in part) (contempt power subject to natural law limitations); State v. Gillaspie, 8 Wash.App. 560, 562, 507 P.2d 1223 (1973) (natural law relation between step-parent and step-child); State v. Russell, 68 Wash.2d 748, 755, 415 P.2d 503 (1966) (providing minor children with necessities of life is a principle of natural law); Kaul v. City of Chehalis, 45 Wash.2d 616, 627, 277 P.2d 352 (1954) (Hill, J., dissenting) (freedom of action and private property are closely related to doctrines of natural law and inalienable rights); In re Hudson, 13 Wash.2d 673, 692, 126 P.2d 765 (1942) (principle of natural law that father knows far better as a rule what is good for his children than a court of justice and (at page 693) the obligation of parents to provide their minor children with the necessaries of life is a principle of natural law); In re Fujimoto's Guardianship, 130 Wash. 188, 193, 226 P. 505, 39 A.L.R. 937 (1924) (by natural law minors are entitled to the guidance and care of their parents); Jordan v. Jordan, Wentworth & Co., 129 Wash. 126, 130, 224 P. 389 (1924) (principle of contribution is not based on contract but natural law); State v. Nakashima, 62 Wash. 686, 689, 114 P. 894 (1911) (incestuous marriage prohibited by natural law); Johnson v. Johnson, 57 Wash. 89, 91, 106 P. 500 (1910) (same); State v. Fenn, 47 Wash. 561, 563, 92 P. 417 (1907) (same); Benton v. Johncox, 17 Wash. 277, 49 P. 495, 497, 39 L.R.A. 107 (1897) (use of stream forms a part of the rights incident to and involved in the ownership of the lands upon its borders and is a matter of natural law which no legislation can change); In re Estate of Wilbur v. Bingham, 8 Wash. 35, 37, 35 P. 407, 408 (1894) (natural law prohibits incestuous marriage); Bloomer v. Todd, 3 Wash. Terr. 599, 618, 19 P. 135, 1 L.R.A. 111 (1888) (privilege of voting not a natural right but a privilege conferred by positive law).
[9] The distinction between positive and natural law was the subject of popular debate, even to the extent of an editorial discussing a Tacoma city ordinance. See Tacoma's Daily Ledger, Oct. 15, 1889, at 2.
[10] "We, the people of the State of Washington, grateful to the Supreme Ruler of the Universe of our liberties, do ordain this constitution." Washington Constitution, Preamble.
[11] Rather, the "liberties" came from a higher source. The framers, then, subscribed to theories of natural law and inherent rights similar to those that inspired the Declaration of Independence and the Bill of Rights in the federal constitution. See L. Tribe, American Constitutional Law 1309 (2d ed. 1988).... Corwin, The "Higher Law" Background of American Constitutional Law, 42 Harv. L.Rev. 149 (1928-1929).

Southcenter Joint Venture v. National Democratic Policy Comm., 113 Wash.2d 413, 438-39, 780 P.2d 1282 (1989) (Utter, J., concurring). The preamble implied that the rights inured in the citizenry rather than emanating from the State.
This point, then, was not controversial. Consequently, listing the rights in the constitution could only have been meant to protect them. This protective function is further implied by the title of "Declaration" rather than "Bill" of rights: the document does not confer rights, it declares those that naturally exist. See Wiggins, Francis Henry and the Declaration of Rights, Washington State Bar News 54 (May 1989).
Southcenter, 113 Wash.2d at 439, 780 P.2d 1282 (Utter, J., concurring).
[12] The natural law tone of the constitution is strengthened by Const. art. 1, § 32. This section declares: "A frequent recurrence to fundamental principles is essential to the security of individual right and the perpetuity of free government." The notion of fundamental principles was central to natural law theories at the time. See Tribe, at 560. That the principles are not spelled out further indicates that the framers looked to other, nongovernmental sources for the origin of the rights listed in the constitution ... these rights are fundamental and naturally occurring....

Southcenter, 113 Wash.2d at 439, 780 P.2d 1282 (Utter, J., concurring).
[13] Brian Snure, A Frequent Recurrence to Fundamental Principles: Individual Rights, Free Government, and the Washington State Constitution, 67 Wash. L.Rev. 669, 673, 686-87 (1992).
[14] See also Charles K. Wiggins, Francis Henry and the Declaration of Rights, Washington State Bar News, May 1989, at 51, 54 ("Under contemporary constitutional jurisprudence, the basic civil liberties were natural and inalienable rights independent of any state constitution."). See Knapp at 233 ("The declarations contained therein are brief, general and comprehensive declarations of the rights of individuals which are deemed to be sacred. These rights are, by common understanding, considered to be inherent in the constitution of things....") and Knapp at 234 ("[The Declaration of Rights] are simply relics of the gage of battle thrown by the people before the oppressive rulers of past decades ... A necessary incident to the security of the state is the lodgement of power somewhere to determine under what circumstances these natural rights may be abridged or denied.").
[15] Benjamin Fletcher Wright, American Interpretations of Natural Law 7 (Russell & Russell 1962) (1931).
[16] An actual page from Justice Sutherland's commonplace book, written by Justice Sutherland in 1882 when he was a 20-year-old law student, quoting Burlamaqui at length in Sutherland's own hand on natural law principles, is reproduced at the beginning of that text.
[17] All crimes are not equal, and it is but equity there should be a due proportion between the crime and the punishment. We may judge of the greatness of a crime, in general, by its object, by the intention of malice of the criminal, and by the prejudice arising to society from it; .... [Factors to consider include the object of the crime, the degree of malice, the nature of the motive, the circumstances of time, place, and custom, the manner of committing the crime, and the severity of the crime.] There are, therefore, crimes less or greater than others; and, consequently, they do not all deserve to be punished with equal severity.

J.J. Burlamaqui, The Principles of Natural and Politic Law at 279-80.
[18] The punishment is too rigorous, if we can by milder means obtain the end proposed; .... We ought as much as possible to incline to the merciful side, when there are not strong reasons for the contrary .... [and] [t]he same punishment does not make the same impressions on all kinds of people, and, consequently, has not the same force to deter them from vice. We ought, therefore, to consider, both in the general penal sanction, and in the application of it, the person of the criminal, and in that all those qualities of age, sex, state, riches, strength, and the like, which may either increase or diminish the sense of punishment. A particular fine, for instance, will distress a beggar, while it is nothing to a rich man.

J.J. Burlamaqui, The Principles of Natural and Politic Law at 281-82.
[19] Blackstone's example is aptly applied to the case at bar since this robber has received a sentence equal, or even exceeding, that for murder.
[20] If we are speaking not about the meat grinder of unwanted millions, not about the cesspool into which they are hurled without pity for the peoplebut about a serious correctional systemthe most complex of questions arises: how it is possible to give monotonously uniform punishments on the basis of a single, unified criminal code? After all, externally equal punishments for different individuals, some more moral and others more corrupted, some more sensitive and some more crude, some educated and some uneducated, are completely unequal punishments. (See Dostoyevsky in many different places in his The House of the Dead.)

English thought has understood this, and they say there (I don't know how much they practice it) that the punishment must fit not only the crime but also the character of each criminal.
Aleksandr I. Solzhenitsyn, The Gulag Archipelago, Vol. 2 at 630 (English ed. 1975) (emphasis in original).
[21] "The factors were: (1) the nature of the offense; (2) the legislative purpose behind the habitual criminal statute; (3) the punishment defendant would have received in other jurisdictions for the same offense; and (4) the punishment meted out for other offenses in the same jurisdiction." Fain, 94 Wash.2d at 397, 617 P.2d 720 (citations omitted).